# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **STATE OF KANSAS,** *ex rel.*,<br>**KRIS W. KOBACH, Attorney General,** | |
| Plaintiff, | **CIVIL ACTION** |
| **v.** | **Case No. 5:23-cv-04035-DDC-RES** |
| **MACQUARIE ENERGY LLC,** | |
| Defendant. | |

**DEFENDANT MACQUARIE ENERGY LLC'S MOTION TO DISMISS PURSUANT TO**
**FEDERAL RULE OF CIVIL PROCEDURE 12(b)(1) AND 12(b)(6)**

## <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ................................................................................................................1

BACKGROUND ................................................................................................................5

ARGUMENT ....................................................................................................................9

    I.      THE COMPLAINT MUST BE DISMISSED FOR LACK OF SUBJECT MATTER JURISDICTION....................................................9

    II.     THE COMPLAINT FAILS TO STATE A CLAIM FOR ANY VIOLATION OF THE COMMODITIES EXCHANGE ACT ............................10

        A.     The Complaint Fails to Identify Any Fraudulent Device, Deceptive Act, or Material Misrepresentation Made in Connection with a Jurisdictional Contract ....................................................................13

        B.     The Complaint Fails to Identify Any Price Manipulation ..............................17

    III.    THE ATTORNEY GENERAL'S CLAIMS ARE PREEMPTED BY FERC'S EXCLUSIVE JURISDICTION ..............................................21

        A.     FERC has Exclusive Jurisdiction over the Rates, Terms, and Conditions of the Sale of Physical Gas Transactions in Interstate Commerce.....................................................................................22

        B.     The Complaint's Sole Focus is on a Physical Gas Transaction That Falls Within FERC's Exclusive Jurisdiction ...................................................25

CONCLUSION ...................................................................................................................27

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ........................................................................................................... 11, 19

*Bache Halsey Stuart Shields, Inc. v. Erdos*,
  667 P.2d 89 (Wash. Ct. App. 1983) ....................................................................................... 10

*Bell Atl. v. Twombly*,
  550 U.S. 544 (2007) ................................................................................................................ 11

*BP America, Inc. v. FERC*,
  52 F. 4th 204 (5th Cir. 2022) ................................................................................................. 25

*Carlson v. Bagley Sec., Inc.*,
  972 F.2d 356 (10th Cir. 1992) ................................................................................................ 16

*Celli v. Shoell*,
  40 F.3d 324 (10th Cir. 1994) ............................................................................................. 9, 10

*Colorado Dep't of Public Health v. United States*,
  693 F.3d 1214 (10th Cir. 2012) ......................................................................................... 21, 22

*Dinnen v. Kneen*,
  2017 WL 4163356 (D. Colo. Sept. 19, 2017) ........................................................................ 16

*Entergy Corp. v. Jenkins*,
  469 S.W.3d 330 (Tex. App. 2015) .......................................................................................... 26

*Farlow v. Peat, Marwick, Mitchell & Co.*,
  956 F.2d 982 (10th Cir. 1992) ........................................................................................... 12, 14

*Gold Kist, Inc. v. Alimenta (U.S.A.), Inc.*,
  319 S.E.2d 37 (Ga. Ct. App. 1984) ........................................................................................ 10

*Goodwill v. eTitle Ins. Agency*,
  2022 WL 1741595 (10th Cir. May 31, 2022) ........................................................................... 9

*Green Plains Trade Grp., LLC v. Archer Daniels Midland Co.*,
  2021 WL 6108920 (C.D. Ill. Aug. 16, 2021) ..................................................................... 11, 16

*Hall v. Bellmon*,
  935 F.2d 1106 (10th Cir. 1991) .............................................................................................. 11

*Harry v. Total Gas & Power N. Am., Inc.*,
   244 F. Supp. 3d 402 (S.D.N.Y. 2017) ..........................................................20, 21, 25

*Hershey v. Energy Transfer*,
   610 F.3d 239 (5th Cir. 2010) .............................................................15, 19, 20, 21

*Hughes v. Talen Energy Marketing, LLC*,
   578 U.S. 150 (2016) ...............................................................................24, 25

*Jacobsen v. Deseret Book Co.*,
   287 F.3d 936 (10th Cir. 2002) ..........................................................................7

*Krukever v. TD Ameritrade, Inc.*,
   337 F. Supp. 3d 1227 (S.D. Fla. 2018) ............................................................11

*Mississippi Power & Light Co. v. Mississippi ex rel. Moore*,
   487 U.S. 354 (1988) ...............................................................................24, 26

*Nantahala Power & Light Co. v. Thornburg*,
   476 U.S. 953 (1986) ......................................................................................24

*Neitzke v. Williams*,
   290 U.S. 319 (1989) ......................................................................................11

*Panhandle Eastern Pipeline Co. v. Oklahoma*,
   83 F.3d 1219 (10th Cir. 1996) ........................................................................26

*Petrella v. Brownback*,
   787 F.3d 1242 (10th Cir. 2015) ......................................................................11

*Sheldon v. Vermonty*,
   31 F. Supp. 2d 1287 (D. Kan. 1998) ...............................................................12

*Smith v. United States*,
   561 F.3d 1090 (10th Cir. 2009) ........................................................................7

*U.S. CFTC v. S. Tr. Metals, Inc.*,
   894 F.3d 1313 (11th Cir. 2018) ......................................................................13

*United States v. Radley*,
   659 F. Supp. 2d. 803 (S.D. Tex. 2009) ..................................................17, 18, 21

*United States v. Reliant Energy Servs.*,
   420 F. Supp. 2d 1043 (N.D. Cal. 2006) ...........................................................18

*In re Universal Serv. Fund Telephone Billing Practice Litig.*,
   619 F.3d 1188 (10th Cir. 2010) ......................................................................21

*Whitelock v. Leatherman*,
   460 F.2d 507 (10th Cir. 1972) ................................................................. 9

*Wu v. Bitfloor, Inc.*,
   460 F. Supp. 3d 418 (S.D.N.Y. 2020) ...................................................... 11

**Statutes**

7 U.S.C. § 2 ........................................................................................................ 12

7 U.S.C. § 6b ...................................................................................................... 13

7 U.S.C. § 6c ...................................................................................................... 12

7 U.S.C. § 9 .................................................................................................. 13, 17

7 U.S.C. § 13 ...................................................................................................... 12

7 U.S.C. § 13a-2 ................................................................................................ 10

7 U.S.C. § 25 ................................................................................................ 10, 12

15 U.S.C. § 717 .................................................................................................. 22

15 U.S.C. §717c-1 .............................................................................................. 22

15 U.S.C. § 717d ........................................................................................... 22, 26

15 U.S.C. § 717t-2 .............................................................................................. 25

Natural Gas Policy Act of 1978, Pub. L. 95-621, 92 Stat. 3350, 15 U.S.C. §§
   3301, *et seq.* (2012) ................................................................. 9, 22, 23, 26

Natural Gas Wellhead Decontrol Act of 1989, Pub. L. No. 101-60,103 Stat. 157
   (1989) (repealing Title I of the Natural Gas Policy Act of 1978) (codified at
   15 U.S.C. §§ 3311-33 (1988)) ............................................................... 23

**Other Authorities**

*Actions Regarding the Commission's Policy on Price Index Formation and
   Transparency*,
   FERC Docket No. PL20-3-000 ................................................................. 3

17 C.F.R. § 180.1 ......................................................................................... 13, 17

17 C.F.R. § 180.2 ......................................................................................... 17, 21

18 C.F.R. § 1c.1 ................................................................................................. 22

iv

18 C.F.R. § 35.41(c) ........................................................................................................... 22

18 C.F.R. § 284.402 ..................................................................................................... 23, 26

*In the Matter of the Cause of the February 2021 Cold Weather Event and its*
    *Impact on Investor Owned Utilities*,
    File No. AO-2021-0264 11 ............................................................................................. 3

Topeka Capital-Journal (Nov. 1, 2022), *available at*
    https://www.cjonline.com/story/business/2022/11/01/kansas-ag-natural-gas-
    price-gouging-investigation-continues-after-uri-derek-
    schmidt/69593160007/?emci=081285ef-f259-ed11-819c-
    002248258d2f&emdi=1f87fc3e-fe59-ed11-819c-
    002248258d2f&ceid=20196463 ................................................................................... 4

## <u>INTRODUCTION</u>

The Kansas Attorney General accuses Macquarie Energy LLC ("Macquarie") of fraud and market manipulation, and seeks tens of millions of dollars, based on two premises:

1. Macquarie agreed to pay the market price offered by a counterparty in an arms'-length transaction for a single, physical gas transaction during the most disruptive weather event and market volatility in decades; and

2. Macquarie, the subsidiary of a financial institution with fiduciary duties to its shareholders, earned revenue during a larger time period encompassing the Winter Storm.

The Attorney General has been investigating purported natural gas market manipulation during the February 2021 Winter Storm for over two years. Macquarie alone provided his office with over five thousand pages of documents. His petition notes that it is based on "review and analysis" of trade information, related communications, proceedings before utility regulators in different states, and other publicly available information. Pet., at 4. The Attorney General also has subpoenaed other natural gas counterparties for documents. Yet, despite this extensive, detailed inquiry, the Attorney General has notably little to say about Macquarie's actual conduct—and nothing that justifies this lawsuit.

The petition relies on two principal theories to bring claims under the Commodities Exchange Act (CEA): (1) Macquarie allegedly used a fraudulent, misleading, or deceptive device (or made a false or misleading report) by agreeing to pay a high price for physical natural gas; and (2) Macquarie allegedly manipulated the price of a commodity by agreeing to pay a high price for physical natural gas. The first theory fails because the Attorney General has not alleged facts showing that Macquarie made any misrepresentation, fraudulent statement, or omission in connection with the February 16 trade—nor that Macquarie had the requisite scienter to do so. Instead, the facts that the Attorney General provides demonstrate that Macquarie paid the price its counterparty offered in an arms'-length transaction, and accurately reported that price. The second

theory likewise fails because the Attorney General alleges no facts showing the requisite fraudulent intent, or that the price Macquarie paid was artificial.

The sole evidentiary support for the claim that Macquarie engaged in purported fraud or manipulation is the fact that Macquarie purchased physical natural gas at a high price in a single transaction that was included in the calculation of the Gas Daily price on the Southern Star pipeline. Beyond this, the petition includes nothing more than conclusory, factually unsupported allegations. The Attorney General provides no factual support for his allegations of manipulation. No factual support for his allegations of fraud. No factual support for his allegations of a misrepresentation or misleading statement. No factual support for any allegation that the February 16 trade was anything but an arms'-length transaction. The petition does not even plead facts showing that Macquarie benefited from any financial natural gas positions based on Southern Star pricing during the storm. These pleading deficiencies would fail to satisfy even Rule 8's standard but are even more clearly fatal here because the Attorney General must satisfy the heightened pleading standard of Rule 9(b). Rule 9 applies both because the Attorney General's claims sound in fraud, and because he can *only* bring claims in state court under the CEA if they sound in fraud. *See* 7 U.S.C. § 13a-2(8)(A).

Not only does the Attorney General fail to plead affirmative facts supporting his claims, but the petition illustrates the obvious economic reasons explaining the high natural gas prices during the Winter Storm, and specifically during the February 16-18 period. The petition acknowledges that "Winter Storm Uri's cold temperatures increased demand for natural gas, and at the same time constricted natural gas production and supply . . . These conditions understandably led to increased natural gas prices during this time." Pet. ¶¶ 79-80. The petition notes that there were "gas price spikes at Southern Star *and other Mid-Continent locations*." Pet. ¶ 117 (emphasis

added); *see also* Missouri Public Service Comm'n, *In the Matter of the Cause of the February 2021 Cold Weather Event and its Impact on Investor Owned Utilities*, File No. AO-2021-0264 ("Missouri Comm'n Report") 11 (showing rise in prices at multiple MidCon locations from February 16-17). As sources cited in the petition show, Southern Star was not alone in having its highest-ever price recorded during the Winter Storm. In Oklahoma, for example, Oneok's Gas Daily price reached $944 on February 17 and $1,193.150 on February 18—the highest daily index price ever recorded there. *See* Initial Comments of the American Public Gas Ass'n, *Actions Regarding the Commission's Policy on Price Index Formation and Transparency*, FERC Docket No. PL20-3-000 ("APGA comments") 6-7. And the petition also explains exactly why Macquarie agreed to pay a high price for natural gas: Southern Star's tariff would have imposed a 2.5x Gas Daily penalty on any party, like Macquarie, whose physical natural gas supplies were out of balance with its schedules, thereby incentivizing parties like Macquarie to purchase gas to replace supply that failed to materialize. Pet. ¶ 99. Had Macquarie not made the February 16 trade, it could have faced large penalties, potentially much higher than the price it paid for the natural gas. The petition accordingly fails to plead the necessary elements of a CEA claim.

But the petition fails for a more fundamental reason. The Attorney General filed his petition in state court, alleging that the state court had jurisdiction over the action pursuant to Section 6d(8)(A) of the CEA, 7 U.S.C. § 13a-2(8)(A). Pet. ¶ 16. That section states that

> Nothing in this chapter shall prohibit an authorized State official from **proceeding in a State court** against any **person registered under this chapter** (other than a floor broker, floor trader, or registered futures association) for an alleged violation of **any antifraud provision** of this chapter or any antifraud rule, regulation, or order issued pursuant to the chapter.

7 U.S.C. §13a-2(8)(A) (emphasis added). The remainder of the CEA provides for exclusive federal jurisdiction. This means that a state court has jurisdiction over a CEA claim only if it is (a) asserted against a person registered under the CEA; and (b) involves an alleged violation of one of the

CEA's antifraud provisions. The Attorney General's petition pleads no facts showing that Macquarie is a "registered person" under the CEA, and in fact Macquarie is *not* registered. The state court never had jurisdiction over this action, therefore, and so this Court lacks subject matter jurisdiction as well. And even if state-court jurisdiction had been proper, that jurisdiction would exist only for antifraud claims—not the price manipulation claims that the Attorney General also includes.

Additionally, the Attorney General's claims are preempted by the Federal Energy Regulatory Commission (FERC)'s exclusive jurisdiction. FERC has exclusive jurisdiction over the rates, terms, and conditions charged for the wholesale sale of physical natural gas. Under governing statutes and regulations, the February 16 trade is presumptively just, reasonable, nondiscriminatory, and not unduly preferential. FERC has conducted a full investigation into natural-gas trading during the Winter Storm, and has not made a finding that any of Macquarie's trades—including the February 16 trade—were anything but just and reasonable. When all of his factually unsupported allegations are stripped away, all the Attorney General has pleaded is that Macquarie engaged in an arms'-length transaction in which it paid a price for physical natural gas that has been approved by FERC. Thus, the Attorney General's petition is nothing more than a collateral attack on the FERC-approved price of physical natural gas under the guise of an unsupported CEA claim. No state has the legal authority to determine that simply paying the purchase price of the February 16 trade, in and of itself, was fraudulent or manipulative.

Perhaps because the Attorney General has been under public scrutiny with regard to his years'-long investigation into the Winter Storm,[1] he views Macquarie as an easy target to win some

---

[1] *See, e.g.*, *What will happen to natural gas price-gouging investigation under new attorney general?*, Topeka Capital-Journal (Nov. 1, 2022), *available at*

public-relations points. Macquarie is a large wholesale gas marketer whose earning statements showed positive returns in 2021. But negative publicity is not a legal basis for filing a meritless complaint accusing Macquarie of violating federal law. The Attorney General must plead sufficient facts to state a claim, and must follow the jurisdictional requirements of the CEA. In spite of his substantial investigation and even with the benefit of his broad investigative authority, he has failed to do so here. Macquarie respectfully requests that the Court dismiss the petition.

## **BACKGROUND**

Macquarie is a wholesale marketer that buys and sells natural gas in interstate commerce throughout the United States; it also imports natural gas from Canada and exports natural gas to Mexico. Macquarie enters into master trading agreements with counterparties that set general terms and conditions to govern individual wholesale natural gas transactions. Macquarie's counterparties are other wholesale natural gas buyers and sellers, including other marketers, natural gas local distribution companies and utilities, owners of natural gas power generation, and natural gas producers, all of whom also purchase and sell natural gas in interstate commerce. Individual counterparty transactions occur when Macquarie and the counterparty with whom it has a master trading agreement agree on terms like price, quantity, and delivery location for specific physical natural gas transactions.

These *physical* transactions—*i.e.*, where gas is actually purchased and delivered —are distinct from *financial* products tied to the price of physical gas. Pet. ¶ 38. Financial products, such as futures contracts, swaps, options, or other derivatives, link their value to the price of physical

---

https://www.cjonline.com/story/business/2022/11/01/kansas-ag-natural-gas-price-gouging-investigation-continues-after-uri-derek-schmidt/69593160007/?emci=081285ef-f259-ed11-819c-002248258d2f&emdi=1f87fc3e-fe59-ed11-819c-002248258d2f&ceid=20196463.

natural gas. Pet. ¶ 71 & n. 9. Financial products are commonly used to offset or hedge the risk of physical trading. *Id.*

Both physical natural gas transactions and financial products can be priced with reference to a pricing index. Platts is a widely used publisher of pricing indices used in the physical and financial natural gas market. Pet. ¶¶ 54-55. Platts calculates location-specific price indices for various regions throughout the United States. Pet. ¶ 56. As relevant here, Platts' Gas Daily publishes daily, location-specific index prices that are based on reported market transactions for the respective location. Pet. ¶ 59. To determine the Gas Daily price for a particular day at a particular location, such as Southern Star, Platts reviews a subset of fixed-price, physical natural gas transactions for that location for the previous day. *Id.* The transactions Platts considers are determined by Platts' own pricing methodology, and typically consist of (1) transactions reported to Platts by the market participants who have elected to serve as price submitters for that location; and (2) exchange trade data. Pet. ¶ 59 n. 6.

In February 2021, extreme cold weather precipitated what is now called Winter Storm Uri (Uri). Uri affected a large geographic region of the United States, including Texas, Oklahoma, Louisiana, and Kansas; it resulted in widespread power outages, and the freezing and shut-in of natural gas wells and pipelines. Gas production across the region dropped substantially. Because of gas scarcity, all market participants needing gas supply went to extensive lengths to find available gas to meet customers' gas requirements. But due to the market conditions and supply and demand, the price of natural gas in the regions affected by Uri rose substantially.

As the sources cited in the petition explain, "[d]uring the peak price period between February 16 and 17, 2021, the price [of gas] escalated in part due to little or no natural gas being available for purchase in certain areas due to not only increased demand, but also production and

processing issues resulting from" Uri. Missouri Comm'n Report 10. Index prices rose exponentially at other locations near Southern Star during this period, and Uri precipitated the highest prices ever on most of the midcontinent pipelines in Texas, Oklahoma, and Kansas.[2] For example, the Gas Daily index price on the OneOK pipeline rose to $944 on February 17 and $1,193 on February 18—and these were just the index prices, with even higher prices paid in individual transactions.

Because the pipeline systems require a constant amount of gas to be flowing to function properly, pipelines need the parties using the system to remain "in balance." Parties who transport natural gas on interstate pipelines like Southern Star are required to submit scheduled volumes of natural gas that are being transported on the pipeline.  As the petition notes, pipelines can and do impose penalties on parties who are "out of balance"—*i.e.*, parties whose scheduled natural gas receipts actually are less than its scheduled deliveries on the pipeline (or vice versa). During Uri, the Southern Star pipeline had a *2.5x Gas Daily imbalance penalty* in place. Pet. ¶ 99. That means that if Macquarie failed to remain in balance, it would have had to pay two-and-a-half times the Gas Daily price for the gas it was unable to purchase and deliver—in addition to potentially facing a claim by the party whose gas Macquarie would have failed to deliver.

---

[2] These prices are in the Gas Daily publications, on which the Attorney General bases his claims and which he discusses throughout the Petition. *See, e.g.*, Pet. ¶¶ 54-62. Indeed, the Gas Daily prices and the Gas Daily Report are mentioned over 140 times in the petition. It is therefore appropriate for the Court to consider them in this motion, along with the other external sources cited in the petition. *See, e.g.*, *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009) ("In evaluating a Rule 12(b)(6) motion to dismiss, courts may consider not only the complaint itself, but also attached exhibits and documents incorporated into the complaint by reference.") (cleaned up); *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002) ("In addition to the complaint, the district court may consider documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity."). Even if the Gas Daily prices were not considered, however, the Attorney General still fails to allege that the price Macquarie paid at Southern Star was inconsistent with the incredibly high-price trends described in the sources cited in the petition.

On February 16, Macquarie agreed to purchase a fixed amount of gas for delivery at the Kansas-Hugoton Pool on February 17, at the fixed price offered. *Cf.* Pet. ¶ 82. This trade was reported in the ordinary course and used by Platts in its Gas Daily methodology. Pet. ¶¶ 83-84. Macquarie has no role in how Platts establishes its index pricing methodology, such as for Gas Daily. Macquarie of course does not control how many transactions are done in the market on any given day, and does not control what gets reported by other natural gas market purchasers or sellers to the index publishers, like Platts, on any given day.

On March 25, 2021, the Kansas Attorney General sent an "Investigation Notice" letter notifying Macquarie that "the office has opened an investigation" into alleged "profiteering" during the Winter Storm. In the letter, the Attorney General made sweeping requests for information, including requests seeking the details of *all* Macquarie's wholesale natural gas trades during February 2021, and all their pipeline nominations during that month. Following execution of a confidentiality agreement on August 5, 2021, Macquarie provided objections and a response to the requests on August 23, 2021. For a year (August 2021 to August 2022), Macquarie heard nothing from the Attorney General. On August 18, 2022, Morgan & Morgan, a private law firm the Attorney General hired, served a subpoena on Macquarie.[3] In response, Macquarie produced 5,520 pages of documents relating to Macquarie's Kansas-specific wholesale physical natural gas transactions. This included data outputs from Macquarie's natural gas scheduling and nomination system of record, as well as transaction information, base contracts, and *force majeure* notices.

---

[3] The Attorney General's office has since terminated its engagement with Morgan & Morgan, and the firm's lawyers now have withdrawn from the case. *See Pink Slips for the Tort Bar*, Wall Street Journal (Mar. 8, 2023); *State of Kansas v. Macquarie Energy LLC*, Case No. 2022-cv-000677, Pltf's Notice of Withdrawal of Appearance (Apr. 17, 2023).

On February 15, 2023, two years after Uri, the Attorney General filed the CEA petition at issue here, in the Third Judicial District, Shawnee County. Macquarie removed the case to this Court on May 2, 2023. *See* ECF No. 1.

## ARGUMENT

Macquarie moves to dismiss the petition on three grounds: (1) lack of subject matter jurisdiction, because the state court did not have jurisdiction over the original action; (2) failure to state a claim under the Commodities Exchange Act; and (3) the Attorney General's price-based claims are preempted by the Natural Gas Act and FERC's exclusive jurisdiction.

## I.   THE COMPLAINT MUST BE DISMISSED FOR LACK OF SUBJECT MATTER JURISDICTION

Where a suit is filed in state court and then removed to federal district court, "the district court acquire[s] no greater jurisdiction than the . . . state court had initially." *Goodwill v. eTitle Ins. Agency*, 2022 WL 1741595, at *2 (10th Cir. May 31, 2022) (citing *Lambert Run Coal Co. v. Baltimore & O.R. Co.*, 258 U.S. 377, 382 (1922)). If the state court lacked jurisdiction over the suit, the federal district court must dismiss the suit for lack of subject matter jurisdiction. *Id.* The plaintiff has the burden of pleading sufficient facts to establish jurisdiction, and "[m]ere conclusory allegations of jurisdiction are not enough; the party pleading jurisdiction must allege in his pleading the facts essential to show jurisdiction." *Celli v. Shoell*, 40 F.3d 324, 326-27 (10th Cir. 1994) (cleaned up); *see also, e.g.*, *Whitelock v. Leatherman*, 460 F.2d 507, 514-15 (10th Cir. 1972) (the "court's jurisdiction must clearly appear from the face of a complaint").

The petition's jurisdictional section here invokes two provisions of the CEA. First, it states that "[t]his action arises under Section 22 of the CEA, 7 U.S.C. § 25." Pet. ¶ 14. Next, it alleges that the state court "has jurisdiction over this action pursuant to Section 6d(8)(A) of the CEA, 7 U.S.C. § 13a-2(8)(A), which allows authorized State officials to bring proceedings in State courts

for alleged violations of the CEA's antifraud provisions and/or any antifraud rules, regulations, or orders promulgated thereunder." Pet. ¶ 16. But neither provision gives the state court jurisdiction over the Attorney General's claims. Section 22, 7 U.S.C. § 25, provides for *exclusive federal jurisdiction*. 7 U.S.C. § 25(c). And Section 6d(8)(A), 7 U.S.C. § 13a-2(8)(A), applies only to proceedings "against any person *registered under this chapter*." True, other provisions of Section 6(d) permit state attorneys general to bring claims against unregistered persons. *See* 7 U.S.C. § 13a-2(1). But *those* claims must be brought in federal court. *See* 7 U.S.C. § 13a-2(2); S. Rep. 95-850, 25 (explaining that it was "determined to make the federal courts the exclusive forum for such actions"); Wright & Miller, 13 Fed. Practice & Procedure § 3527 n. 13 (noting that § 13a-2(2) provides for exclusive federal jurisdiction); *Gold Kist, Inc. v. Alimenta (U.S.A.), Inc.*, 319 S.E.2d 37, 37-38 (Ga. Ct. App. 1984) (describing exclusive federal jurisdiction under the CEA); *Bache Halsey Stuart Shields, Inc. v. Erdos*, 667 P.2d 89, 92 (Wash. Ct. App. 1983) (similar). Presumably for this reason, the Attorney General did not invoke this section as a basis for jurisdiction here.

The petition does not plead any facts showing that Macquarie is a "person registered" under the CEA. This means that the Attorney General has failed to satisfy his burden of pleading sufficient facts to support jurisdiction. *See Celli*, 40 F.3d at 326-27 (dismissing complaint for failure to allege fact showing that defendant met statutory basis for suit). And, in fact, Macquarie is not a "person registered" under the CEA. So the state court had no jurisdiction over the petition, because the petition does not and cannot satisfy the plain text of 7 U.S.C. § 13a-2(8)(A).

Because the state court where the action was originally filed lacked jurisdiction, this Court likewise lacks jurisdiction, and must dismiss the complaint.

## II.     THE COMPLAINT FAILS TO STATE A CLAIM FOR ANY VIOLATION OF THE COMMODITIES EXCHANGE ACT

Even if the Court disagrees with this jurisdictional analysis, the complaint must be dismissed for failure to state a claim upon which relief can be granted. Under Rule 12(b)(6), the Court assumes as true all well-pleaded factual allegations and determines whether they plausibly give rise to an entitlement of relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). To survive a motion to dismiss, a complaint must contain sufficient factual matter to state a claim which is plausible—and not merely conceivable—on its face. *Id.*; *Bell Atl. v. Twombly*, 550 U.S. 544, 555 (2007). The Court need not accept as true those allegations which state only legal conclusions. *See Iqbal*, 662 U.S. at 678-79.

The Attorney General bears the burden to frame his complaint with enough factual detail to suggest he is entitled to relief; it is not enough to make threadbare recitals of a cause of action accompanied by mere conclusory statements. *Iqbal*, 662 U.S. at 678. The Attorney General must show more than a possibility Macquarie has acted unlawfully—it is not enough to plead facts that are "merely consistent with" Macquarie's liability. *Id.* A pleading which offers labels and conclusions, a formulaic recitation of the elements of a cause of action, or naked assertions devoid of further factual enhancement will not stand. *Id.* Likewise, if an issue of law precludes relief, dismissal is appropriate. *Neitzke v. Williams*, 490 U.S. 319, 326 (1989); *Petrella v. Brownback*, 787 F.3d 1242, 1268 (10th Cir. 2015).

Here, because each of the Attorney General's claims sounds in fraud, *see* Pet. ¶¶ 135, 136, 138, 143, 147, the heightened pleading standards of Rule 9(b) apply. *See, e.g.*, *Wu v. Bitfloor, Inc.*, 460 F. Supp. 3d 418, 423 (S.D.N.Y. 2020); *Green Plains Trade Grp., LLC v. Archer Daniels Midland Co.*, 2021 WL 6108920, at *3 (C.D. Ill. Aug. 16, 2021); *Krukever v. TD Ameritrade, Inc.*, 337 F. Supp. 3d 1227, 1235 (S.D. Fla. 2018) (all applying Rule 9(b) to CEA claims). Indeed, the Attorney General can *only* bring claims in state court under the CEA if they sound in fraud. *See* 7

U.S.C. § 13a-2(8)(A) ("Nothing in this chapter shall prohibit an authorized State official from proceeding . . . against any person registered under this chapter . . . for an alleged violation of any *antifraud* provision of this chapter or any *antifraud* rule, regulation, or order issued pursuant to this chapter.") (emphasis added). The Attorney General recognizes as much. Pet. ¶ 16.

"Historically, the Tenth Circuit has strictly enforced Rule 9(b)'s requirement that the alleged false or misleading statements be pleaded with sufficient particularity." *Sheldon v. Vermonty*, 31 F. Supp. 2d 1287, 1291 (D. Kan. 1998). The Attorney General must allege "*what* misrepresentations were made, *when* these misrepresentations were made, [and] *how* these misrepresentations furthered the alleged fraudulent scheme." *Farlow v. Peat, Marwick, Mitchell & Co.*, 956 F.2d 982, 986 (10th Cir. 1992) (internal quotation marks omitted). He also must plead specific intent with particularity. *Sheldon*, 31 F. Supp. 2d at 1292 (collecting cases). He has failed to do so here. In fact, the petition fails to satisfy even Rule 8's more liberal pleading standard.

The petition asserts claims under various provisions of the CEA, namely 7 U.S.C. §§ 6b(a), 9(1), 9(3), and 17 C.F.R. §§ 180.1, 180.2. Pet. ¶¶ 137, 143.[4] Sections 6b(a) and 9(1), and Rule 180.1, deal with fraudulent devices and material misrepresentations; section 9(3) and Rule 180.2 deal with price manipulation. Macquarie addresses each in turn.

---

[4] The petition includes citations to other sections of the CEA that are either inapplicable or do not create substantive causes of action. Pet. ¶¶ 137, 143. 7 U.S.C. § 6c applies only to "the execution of a transaction . . . involving the purchase or sale of any commodity for future delivery (or any option on such a transaction or option on a commodity) or swap"; the Attorney General has alleged only a physical spot gas transaction, which does not meet this definition. 7 U.S.C. § 13 is a criminal provision, which is not applicable here. And 7 U.S.C. § 25 creates a private right of action for persons who (i) received trading advice from the defendant; (ii) made a commodities trade through the defendant; or (iii) purchased an option or swap from the defendant; none of which applies to the Attorney General. Furthermore, as noted above, federal courts have exclusive jurisdiction of claims brought under that section. *See* 7 U.S.C. § 25(c). As for the Attorney General's claim for principal-agent liability under 7 U.S.C. § 2(a)(1)(B), *see* Pet. ¶¶ 146-48, this claim fails for lack of an underlying substantive violation.

**A. The Complaint Fails to Identify Any Fraudulent Device, Deceptive Act, or Material Misrepresentation Made in Connection with a Jurisdictional Contract**

Section 6(b) of the CEA makes it "unlawful . . . for any person . . . in or in connection with . . . any contract of sale of any commodity to cheat or defraud or attempt to cheat or defraud the other person . . . [or] willfully to make . . . any false report or statement . . . [or] willfully to deceive or attempt to deceive the other person by any means whatsoever." 7 U.S.C. § 6b(a)(2). Section 9 of the same chapter is similar, providing that "[i]t shall be unlawful for any person . . . to use . . . in connection with any . . . contract of sale of any commodity . . . any manipulative or deceptive device or contrivance." 7 U.S.C. § 9(1). The CFTC's regulation 17 C.F.R. 180.1 declares it "unlawful for any person . . . in connection with any . . . contract of sale of any commodity . . . to intentionally or recklessly . . . use . . . any manipulative device, scheme, or artifice to defraud; . . . [or] [m]ake . . . any untrue or misleading statement of a material fact or to omit to state a material fact necessary . . . to make the statements made not untrue or misleading; . . . [or] [e]ngage . . . in any act . . . which operates . . . as a fraud or deceit upon any person." 17 C.F.R. 180.1(a).

Clear precedent holds that to demonstrate a CEA claim under these sections, the Attorney General "must prove the same three elements to establish liability under each of the above provisions: (1) the making of a misrepresentation, misleading statement, or a deceptive omission; (2) scienter; and (3) materiality." *U.S. CFTC v. S. Tr. Metals, Inc.*, 894 F.3d 1313, 1325 (11th Cir. 2018) (internal quotation marks omitted). The Attorney General is required to demonstrate that Macquarie actually used a fraudulent device or made a misrepresentation, misleading statement, or deceptive omission; and that Macquarie acted with the requisite intent or recklessness.  Here, the petition necessarily fails.

First, the Attorney General has failed to provide any factual support for the allegation that a fraudulent device or artifice was used. The petition simply acknowledges that Macquarie agreed to pay the price offered by its counterparty in an arms'-length transaction and reported the details of that trade to Platts in accordance with standard reporting principles. Pet. ¶¶ 82-84. There are no allegations that the price was falsely reported, that Macquarie misrepresented any facts about the price or the trade to anyone, or that Macquarie in fact made *any* other statements in connection with the trade—except for the Attorney General's boilerplate recitation of the elements of a CEA fraud claim at the end of the petition. Pet. ¶ 143. That statement falls miles short of the requirement that he allege the content of any fraudulent statements, to whom they were made, and reasonable reliance. *See Farlow*, 956 F.2d at 986.

Second and similarly, the Attorney General has failed to allege any facts showing that Macquarie made a material misrepresentation or false report. Again, the petition does not contend that Macquarie misrepresented or misreported the price of the February 16 trade, or point to any other false statement that would "affect or tend to affect the price of any commodity in interstate commerce." 17 C.F.R. 180.1(a)(4).

Third, the Attorney General has failed to demonstrate scienter. Nowhere in the petition does the Attorney General provide a scintilla of evidence that Macquarie intended to manipulate the price of natural gas through its purchase of natural gas on Southern Star.  Nor has the Attorney General pleaded facts that demonstrate or support the notion that Macquarie's purchase was an act of recklessness. Nowhere does the Attorney General provide any evidentiary support that Macquarie did anything other than purchase natural gas at arms' length and then accurately report that transaction.

Instead, the Attorney General merely makes unsupported allegations that Macquarie executed a high-priced physical natural gas purchase in order to affect the prices of unspecified physical and financial gas contracts. Pet. ¶¶ 107-109, 111-13. The petition makes allegations that Macquarie benefitted from a rise in natural gas prices on Southern Star, yet provides only conclusory evidence of the impact of the single transaction Macquarie's physical natural gas position, and no evidence of the impact on Macquarie's financial gas position. This is not an adequate demonstration of intent or recklessness.[5] *See, e.g.*, *Hershey v. Energy Transfer*, 610 F.3d 239, 248 (5th Cir. 2010) (noting that it would be "counterproductive" for the defendants to drive down the Henry Hub index spot price because they benefited from a greater return on their financial basis swaps if the price was higher); *Prof'l Serv. Industries, Inc. v. Kimbrell*, 834 F. Supp. 1289, 1296 (D. Kan. 1993) (insufficient evidence of scienter where no evidence of knowledge of misrepresentations or fraudulent omissions); *Krukever*, 337 F. Supp. 3d at 1241.  This is especially true when the facts in the record provide actual support for the high prices of natural gas in Kansas *and throughout the mid-continent*, as well Macquarie's need to purchase gas at any price in order to avoid a 2.5x Gas Daily index penalty on Southern Star—illustrating that far from *intending* to acquire gas at a high price as part of some scheme, Macquarie was constrained to do so by market forces.

---

[5] The petition also contends that the Southern Star Gas Daily price is susceptible to manipulation because it is typically based on fewer than fifteen trades per day. Pet. ¶¶ 74-78. The petition does not allege that Macquarie was aware that there would be only one other qualifying trade on February 16, however. As explained above, Platts calculates the Gas Daily price for a particular location based on its own methodology and several inputs. *See supra*, at 6. And many other indices are based on only a handful of trades. *See* APGA comments 5-6 (Texas Gas Zone SL price was based on 2-3 trades from February 13-18; Enable Gas, East price was based on 2 trades for February 17 and 5 trades for February 18).

Finally, to support a claim, the Attorney General must allege facts showing that any intentional or reckless misstatement or omission was made "in connection with" the commodities contract. The only transaction Macquarie entered into that is pleaded in the petition is the February 16 trade. This trade is described in the petition as nothing more than an arms'-length transaction between market participants. The Attorney General does not plead facts showing that Macquarie intended to or made any misleading statements about or in connection with that trade. *See FDIC v. UMIC, Inc.*, 136 F.3d 1375, 1384 (10th Cir. 1998) ("The 'in connection with' language . . . of the CEA requires the alleged fraud to concern the fundamental nature of the futures contract; that is, the fraud must involve the quality of or the risks associated with the investment."). Courts have rejected CEA claims based on even more robust allegations than those made here for failure to allege fraudulent behavior "in connection with" the necessary contract. In *Green Plains*, for example, the plaintiffs alleged that the defendant engaged in economically irrational practices with respect to its physical ethanol trading "in order to leverage even larger profits on its derivatives contracts." *Green Plains Trade Grp., LLC v. Archer Daniels Midland Co.*, 2021 WL 6108920, at *1-2 (C.D. Ill. Aug. 16, 2021). But because the plaintiffs were traders in the *physical* markets, did not "allege that they or other proposed class members purchased or sold futures contracts or other derivatives contracts," and did not plead that the defendant "made a misrepresentation in connection with any order to make or the making of any contract of sale of any commodity," the court held plaintiffs failed to state any claims under the CEA. *Id.* at *3-4; *see also, e.g.*, *Carlson v. Bagley Sec., Inc.*, 972 F.2d 356 (10th Cir. 1992) (holding that when a defendant's alleged misrepresentations did not cause the plaintiff to purchase the stock at issue, the plaintiff fails to satisfy the "in connection with" requirement); *Dinnen v. Kneen*, 2017 WL 4163356, at *6 (D. Colo. Sept. 19, 2017) (dismissing securities fraud claim for failing to satisfy the "in connection with"

requirement because the alleged misrepresentations were made with respect to the contribution of funds based on a letter of intent, not a security).[6]

Accordingly, the petition fails to state a claim under 7 U.S.C. §§ 6b(a), 9(1), 9(2) and 17 C.F.R. 180.1.

### B.  The Complaint Fails to Identify Any Price Manipulation

The Attorney General's price manipulation claims must be dismissed because they could not have been brought in state court. As the CEA states—and as the petition acknowledges, *see* Pet. ¶ 16—a state attorney general may bring CEA claims against registered person in state court only to the extent the claims are premised on a violation of the CEA's "antifraud" provisions, rules, or regulations. 7 U.S.C. §13a-2(8)(A). And the CEA's antifraud sections discussed above are distinct from its price manipulation sections. *Compare, e.g.*, 7 U.S.C. § 9(1) and 17 C.F.R. 180.1 *with* 7 U.S.C. § 9(3) and 17 C.F.R. 180.2. So, because the Attorney General originally filed this action in state court, the state court lacked jurisdiction over his price manipulation claims and those claims must be dismissed for lack of subject matter jurisdiction (the Attorney General's "First Claim for Relief.").

Even if this Court did have jurisdiction, the price manipulation claims would have to be dismissed for failure to state a claim. To prove unlawful price manipulation under 7 U.S.C. § 9(3) and 17 C.F.R. 180.2, the Attorney General must show: "(1) the defendant possessed the ability to influence prices, (2) an artificial price existed, (3) the defendant caused the artificial price, and (4) the defendant specifically intended to cause the artificial price." *United States v. Radley*, 659 F. Supp. 2d. 803, 813 (S.D. Tex. 2009) (cleaned up). The manipulation must be of "the price of any

---

[6] Because of the relative dearth of caselaw interpreting the CEA, courts look to cases interpreting securities claims under section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder. *UMIC*, 136 F.3d at 1384 n.4.

swap, or of any commodity in interstate commerce." 17 C.F.R. 180.2. For "[l]arge market participants, like [Macquarie], . . . [t]heir individual supply and demand are part of the aggregate, and it is axiomatic that their actions will affect the price of a commodity. Acting in a manner that shifts the price of a commodity in a favorable direction is the business of a profit-making enterprise, and if it is done without fraud or misrepresentation, it does not clearly violate the CEA." *Radley*, 659 F. Supp. 2d at 816.

Accepting the premise that Macquarie possessed the ability to influence prices, the Attorney General nevertheless has failed to plead the remaining required elements of unlawful price manipulation. "[T]o determine whether an artificial price has occurred, one must look at the aggregate forces of supply and demand and search for those factors which are extraneous to the pricing system, are not a legitimate part of the economic pricing of the commodity, or are extrinsic to that commodity market. When the aggregate forces of supply and demand bearing on a particular market are all legitimate, it follows that the price will not be artificial. On the other hand, when a price is effected by a factor which is not legitimate, the resulting price is necessarily artificial." *In re Indiana Farm Bureau*, No. 75-14, 1982 WL 30249, at *35 n.2 (CFTC 1982)).

The petition makes a conclusory allegation that the prices of the February 16 trade and February 17 Gas Daily index price published by Platts "were artificial prices, and neither reflected basic forces of supply and demand and/or normal market forces," without actually providing any support for this statement. Pet. ¶ 90. But the Attorney General's allegation that the prices were artificial is defeated by other assertions in the petition. For instance, the petition asserts that other prices at Southern Star on that date were lower, so the price Macquarie agreed to pay must necessarily have been artificial. Pet. ¶¶ 92-95. The petition, however, includes no details of these trades and conveniently ignores the fact that there might have been unreported sales of natural gas

at Southern Star that were higher than price paid by Macquarie.[7] It also ignores the severe market conditions that affected the price of gas at Southern Star *and numerous nearby pipeline locations*, as well as the significant penalties Macquarie could have faced had it not purchased enough gas on February 16. *See supra*, at 6-7. The petition likewise ignores that Macquarie simply agreed to pay the price offered by a counterparty in an arms'-length transaction, at a time when anyone with a gas supply obligation was desperate for gas to fulfill their contractual obligations and avoid penalties.

Boiled down, on one side there is the Attorney General's bald assertion that the price was "artificial." On the other side, there is actual evidence of the rise in prices at equivalent locations, the pressure from pipeline penalties, the competition among market participants like marketers, utilities, and power generators for gas, and the presumptive efficiency of the market in which Macquarie was trading—all legitimate "aggregate forces of supply and demand."[8] The Attorney General has failed to satisfy even Rule 8's requirement that he show more than a sheer possibility that Macquarie acted unlawfully, *Iqbal*, 556 U.S. at 678, much less satisfy Rule 9's requirement of particularity.

Equally fatal, and as noted earlier, the petition alleges no facts showing that Macquarie or its trader had the specific intent to manipulate the price of any relevant commodity or derivative contract. Courts routinely reject CEA manipulation claims when there are no allegations of the requisite specific intent. In *Hershey v. Energy Transfer*, the plaintiffs made allegations similar to

---

[7] Parties to physical natural gas transactions are not required to price report to index publishers. Those who do price report, do so voluntarily.

[8] The petition cites to a news article describing a DOJ investigation into "suspected manipulation of energy pricing benchmarks," Pet. ¶ 100, but there is no connection to Southern Star, much less Macquarie.

those here: that the defendants had intentionally manipulated the price of natural gas as reported

to Platts and that the defendants "knew or should have known that their manipulation of natural

gas prices . . . would result in the artificial suppression of the prices of NYMEX natural gas futures

contracts." 610 F.3d 23, 248 (5th Cir. 2010). The Fifth Circuit held:

> Plaintiffs' argument is without merit: intentionality and inevitability are not legally
> equivalent. . . . Under a specific intent standard, mere knowledge is not enough;
> Defendants must have specifically intended to impact the NYMEX natural gas
> futures market.

*Id.* at 248-49. The Fifth Circuit also pointed out that the manipulation of the natural gas price was

actually counterproductive to the defendants' return on financial basis swaps, illustrating that the

plaintiffs' allegations were insufficient. *Id.* at 248.

Likewise, in *Braman v. The CME Group*, the court dismissed the plaintiffs' CEA claims

because there was no allegation the defendants intended to cause artificial prices in the futures

market; the plaintiffs alleged only that the defendants incentivized high frequency trading, which

in turn had an effect on commodities prices. 149 F. Supp. 3d 874, 889-90 (N.D. Ill. 2015). And in

*Sonterra Capital v. Barclays*, the court held that the plaintiff "pleads no facts indicating, much less

giving rise to a strong inference, that Defendants' conduct with respect to Sterling LIBOR was

intended to manipulate the prices of any particular financial instrument at issue in this case." 366

F. Supp. 3d 516, 553 (S.D.N.Y. 2018). The plaintiffs' allegation that the defendants "as some of

the largest dealers in the Sterling LIBOR-based derivatives all shared a common motive to increase

profits through manipulation" was plainly insufficient to support a claim, as "such a generalized

motive, one which could be imputed to any corporation with a large market presence in any

commodity market, is insufficient to show intent." *Id.* at 553-54.

The Attorney General's allegations here are just as threadbare, if not more so, than the

allegations courts found insufficient in these cases. The petition contends that Macquarie had an

incentive to manipulate the Southern Star price to increase its profits on its physical trading at Southern Star. Pet. ¶¶ 107-108. Tellingly, it cites no evidence of an *intent* to conduct this manipulation—such as the kind of communications or directives that the CFTC cites to in its enforcement actions—but simply the supposition of an incentive to push the Southern Star price up. This profit incentive is insufficient as a matter of law to support a claim. *See Radley*, 659 F. Supp. 2d at 816; *Sonterra*, 366 F. Supp. 3d. 553-54.

More importantly, the Attorney General admits there is no evidence Macquarie *intended to manipulate the price of Southern Star derivatives*, and instead relies simply on the allegation that Macquarie's alleged physical natural gas manipulation "directly and necessarily harmed traders in Southern Star derivatives." Pet. ¶ 133. This is not enough, because "intentionality and inevitability are not legally equivalent." *Hershey*, 610 F.3d at 248-49.

The petition therefore fails to state a claim under 7 U.S.C. § 9(3) and 17 C.F.R. 180.2.

### III.   THE ATTORNEY GENERAL'S CLAIMS ARE PREEMPTED BY FERC'S EXCLUSIVE JURISDICTION

Finally, the Attorney General's claims must be dismissed because they are preempted. Federal preemption of state law or state agency action "can occur in one of three ways: 1) when a federal statute expressly preempts state law ('express preemption'); 2) where Congress intends to occupy a field ('field preemption'); and 3) to the extent that a state law conflicts with a federal law ('conflict preemption')." *Colorado Dep't of Public Health v. United States*, 693 F.3d 1214, 1223 (10th Cir. 2012). "Conflict preemption occurs where it is impossible for a party to comply with both state and federal requirements, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *In re Universal Serv. Fund Telephone Billing Practice Litig.*, 619 F.3d 1188, 1196 (10th Cir. 2010) (internal quotation marks omitted). "To avoid conflict preemption, it is not enough to say that the ultimate goal of both

federal and state law is the same. A state law is also pre-empted if it interferes with the methods by which the federal statute was designed to reach this goal." *Colorado Dep't of Public Health*, 693 F.3d at 1224. Here, the Attorney General's claims based on the price of a physical, wholesale gas transaction—with no other facts to support his claims—are necessarily preempted because the mere declaration that the price of the February 16 trade was artificial or somehow manipulative *simply because of its price* conflicts with FERC's exclusive authority to regulate the price of such transactions.

### A.   FERC has Exclusive Jurisdiction over the Rates, Terms, and Conditions of the Sale of Physical Gas Transactions in Interstate Commerce

The Natural Gas Act (NGA) gives FERC exclusive jurisdiction over (1) "the transportation of natural gas in interstate commerce"; (2) "the sale in interstate commerce of natural gas for resale"; and (3) "natural-gas companies engaged in such transportation or sale." 15 U.S.C. § 717(b). The NGA also gives FERC the exclusive authority to determine whether "any rate, charge, or classification . . . collected by any natural-gas company in connection with any transportation or sale of natural gas, subject to the jurisdiction of [FERC]" or "any rule, regulation, practice, or contact affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory, or preferential." 15 U.S.C. § 717d(a). FERC also regulates wholesale (or "jurisdictional") natural gas transactions through its jurisdiction over market manipulation. *See* 15 U.S.C. § 717c-1; 18 C.F.R. § 1c.1. And FERC regulates the reporting of wholesale natural gas prices (*e.g.*, to Platts Gas Daily) under its market behavior rules. *See* 18 C.F.R. § 35.41(c).

Deregulation of the natural gas industry through the Natural Gas Policy Act of 1978 (NGPA),[9] as amended by the Natural Gas Wellhead Decontrol Act of 1989,[10] fundamentally changed the natural gas market. As a result of these statutes, and several of FERC's implementing orders,[11] all companies that are not interstate natural gas pipelines, or their affiliates, have been granted "blanket certificates" to engage in FERC-jurisdictional wholesale natural gas sales transactions. This means that all such wholesale natural gas sales, by law, are deemed to be just and reasonable, not unduly discriminatory, and not unduly preferential—unless and until FERC determines otherwise.[12]

The United States Supreme Court has repeatedly found state action regarding natural gas or power transactions—particularly state action affecting pricing—to be preempted by the NGA

---

[9] Pub. L. 95-621, 92 Stat. 3350, 15 U.S.C. §§ 3301, *et seq.* (2012).

[10] Pub. L. No. 101-60,103 Stat. 157 (1989) (repealing Title I of the Natural Gas Policy Act of 1978) (codified at 15 U.S.C. §§ 3311-33 (1988)).

[11] *See, e.g.*, *Regulations Governing Blanket Marketer Sales Certificates*, FERC Stats. & Regs. ¶ 30,957 (1992), *order on reh'g and clarification*, 62 F.E.R.C. ¶ 61,239 (1993) (collectively "Order No. 547"), codified at 18 C.F.R. § 284.402 (2021); *Amendments to Blanket Sales Certificates*, FERC Stats. & Regs. ¶ 31, 153 ("Order No. 644"), *reh'g denied*, 107 FERC ¶ 61,174 (2004) ("Order No. 644-A").

[12] *See Pipeline Service Obligations and Revisions to Regulations Governing Self-Implementing Transportation Under Part 284 of the Commission's Regulations, and Regulation of Natural Gas Pipelines After Partial Wellhead Decontrol*, FERC Stats. & Regs. ¶ 30,939, 57 Fed. Reg. 13267-02, 13297 (1992) ("To repeat, there is no doubt, as Congress expressly found and confirmed, that a competitive market exists for gas at the wellhead and in the field . . . It is important to note that only Congress can 'deregulate.' Therefore, the Commission is instituting light-handed regulation, relying upon market forces at the wellhead or in the field to constrain unbundled pipeline sale for resale gas prices within the NGA's 'just and reasonable' standard."), III FERC Stats. & Regs. ¶ 30,939 (Apr. 8, 1992), *reh'g granted and denied in part*; Order No. 636-A, III FERC Stats. & Regs. ¶ 30,950 (Aug. 3, 1992), *order on reh'g*; Order No. 636-B, 61 F.E.R.C. ¶ 61,272 (Nov. 27, 1992) (codified at 18 C.F.R. pt. 284), *reh'g denied*; 62 F.E.R.C. ¶ 61,007 (1993), *aff'd in part and remanded in part*, *United Distribution Cos. v. FERC*, 88 F.3d 1105 (D.C. Cir. 1996).

or the Federal Power Act.[13] *See, e.g.*, *Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953 (1986); *Mississippi Power & Light Co. v. Mississippi ex rel. Moore*, 487 U.S. 354 (1988); *Hughes v. Talen Energy Marketing, LLC*, 578 U.S. 150 (2016). In *Nantahala Power & Light*, the Court addressed a North Carolina agency's allocation of power between two power companies and held that it was preempted by FERC's exclusive jurisdiction over wholesale power rates. 476 U.S. at 955. The Court observed: "FERC clearly has exclusive jurisdiction over the rates to be charged Nantahala's interstate wholesale customers. Once FERC sets such a rate, a State may not conclude in setting retail rates that the FERC-approved wholesale rates are unreasonable. A State must rather give effect to Congress' desire to give FERC plenary authority over interstate wholesale rates, and to ensure that the States do not interfere with this authority." *Id.*, at 966.

The Court applied the same reasoning in *Mississippi Power & Light*, finding that Mississippi could not refuse to permit an increase in the company's retail rates that was necessitated by certain FERC-authorized orders relating to wholesale rates. 487 U.S. at 356-57. The Court said that "States may not alter FERC-ordered allocations of power by substituting their own determinations of what would be just and fair"; that "States may not bar regulated utilities from passing through to retail consumers FERC-mandated wholesale rates"; and that "[t]he reasonableness of rates and agreements regulated by FERC may not be collaterally attacked in state or federal courts." *Id.*, at 371, 372, 375.

And in *Hughes*, the Court held that a Maryland program regarding subsidies for electricity generators was preempted by FERC's exclusive jurisdiction over the wholesale energy market. 578 U.S. at 154. The Maryland program required participation in power capacity auctions and

---

[13] Because of the similarities between the two acts, courts have treated precedents under each to apply to the other. *See Hughes v. Talen Energy Marketing, LLC*, 578 U.S. 150, 164 n.10 (2016).

guaranteed a rate different from the interstate wholesale rate; therefore, "[b]y adjusting an interstate wholesale rate, Maryland's program invades FERC's regulatory turf." *Id.*, at 163.[14]

These precedents illustrate that state action targeted at a FERC-approved rate or price is preempted.

### B. The Complaint's Sole Focus is on a Physical Gas Transaction That Falls Within FERC's Exclusive Jurisdiction

The crux of the petition is a single physical, wholesale natural gas transaction. The Attorney General's sole argument is that because Macquarie purchased physical natural gas at the price it did, the transaction is *de facto* a fraud-based and price-based manipulation. The Attorney General offers no facts to support this claim other than the fact of the high price. As such, the Attorney General's CEA claims are preempted.

While it is true that the CFTC has jurisdiction to police potential fraud and manipulation in the sale of all commodities—including natural gas—in interstate commerce, FERC has exclusive jurisdiction over the rates, terms, and conditions of the wholesale sale of physical natural gas in interstate commerce. *See Harry v. Total Gas & Power N. Am.*, 244 F. Supp. 3d 402, 409-410 (S.D.N.Y. 2017) (describing how FERC and the CFTC divided authority over "the natural gas and futures and options markets, respectively"); 15 U.S.C. § 717t-2(c)(1) (directing FERC and the CFTC to enter into a memorandum of understanding to "ensur[e] that information requests to markets *within the respective jurisdiction of each agency* are properly coordinated") (emphasis added).

---

[14] In *OneOK, Inc. v. Learjet, Inc.*, the Court clarified that state antitrust claims based on allegations of market manipulation and trading practices—*not* just price—that affected *retail* sales were not preempted by the Natural Gas Act. 575 U.S. 373 (2015). Since *OneOK*, courts have reaffirmed that FERC's jurisdiction over wholesale natural-gas pricing is exclusive and absolute. *See, e.g.*, *BP America, Inc. v. FERC*, 52 F. 4th 204, 218 (5th Cir. 2022).

Because the February 16 trade was made pursuant to FERC-granted blanket certificate authority, the transaction is by law not "unjust, unreasonable, unduly discriminatory, or preferential." 15 U.S.C. § 717d(a); *see* 18 C.F.R. § 284.402. Here, FERC has announced that it investigated wholesale natural gas market activities during Uri, and it made no finding that Macquarie's wholesale gas transaction in Kansas or elsewhere violated FERC's market manipulation jurisdiction.[15] In the absence of any other facts or evidence, the Attorney General seeks a determination that the price Macquarie paid in the February 16 trade was artificial and a manipulation. But such a determination would necessarily conflict with FERC's exclusive jurisdiction and finding that such price was a just and reasonable market price. Pet. ¶¶ 135-39; 143. The Kansas Attorney General "may not alter FERC-ordered allocations of power by substituting [his] own determinations of what would be just and fair" and "[t]he reasonableness of rates and agreements regulated by FERC may not be collaterally attacked" by state actors. *Mississippi Power & Light*, 487 U.S. at 372, 375; *see also Panhandle Eastern Pipeline Co. v. Oklahoma*, 83 F.3d 1219, 1221 (10th Cir. 1996) (holding that state law regarding royalties imposed on interstate purchasers of natural gas was "preempted by federal law insofar as it burdens interstate purchasers of natural gas"); *Entergy Corp. v. Jenkins*, 469 S.W.3d 330, 345 (Tex. App. 2015) (dismissing state claims that turned on the price of wholesale gas rates "[b]ecause resolving the dispute in this case involves the consideration and interpretation of a FERC-approved tariff" and therefore "this dispute falls within FERC's exclusive jurisdiction"). The Attorney General's claims therefore are in direct conflict with federal law. He improperly seeks to intrude on FERC's exclusive authority granted by Congress granted in the NGA.

---

[15] *See, e.g.*, *FERC to Examine Potential Wrongdoing in Markets During Recent Cold Snap*, https://www.ferc.gov/news-events/news/ferc-examine-potential-wrongdoing-markets-duringrecent-cold-snap.

The CEA claims must therefore be dismissed.

## **CONCLUSION**

Macquarie respectfully requests that the Court dismiss the petition with prejudice.

Dated:   May 8, 2023

Respectfully submitted,

*/s/ Stephen R. McAllister*
Stephen R. McAllister (Bar No. 15845)
**DENTONS US LLP**
4520 Main Street Suite 1100
Kansas City, Missouri 64111-7700
stephen.mcallister@dentons.com

**SUSMAN GODFREY L.L.P.**
William R.H. Merrill (*pro hac vice forthcoming*)
Susman Godfrey L.L.P.
1000 Louisiana, Suite 5100
Houston, Texas 77002
Telephone: (713) 653-7865
bmerrill@susmangodfrey.com

Beatrice C. Franklin (*pro hac vice forthcoming*)
1301 Avenue of the Americas, 32nd Floor
New York, NY 10025
Telephone: (212) 336-8330
bfranklin@susmangodfrey.com

**BAKER BOTTS LLP**
Michael Yuffee (*pro hac vice forthcoming*)
700 K Street, NW
Washington, D.C. 20001
Telephone: (202) 639-1132

*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 8th day of May, 2023, a true and correct copy of the above and foregoing was e-filed with the Court's CM/ECF electronic filing system, which provided notice to all parties who have entered an appearance in this action.

/s/ *Stephen R. McAllister*
*Attorney for Defendant*