**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| **THE STATE OF KANSAS, ex rel., KRIS W. KOBACH, ATTORNEY GENERAL,** | |
| *Plaintiff*, | |
| v. | **CIVIL ACTION** <br> **Case No. 5:23-cv-04035-DDC-RES** |
| **MACQUARIE ENERGY LLC, and JOHN DOES 1 through 10,** | |
| *Defendants.* | |

## PLAINTIFF STATE OF KANSAS' RESPONSE IN OPPOSITION TO DEFENDANT MACQUARIE'S MOTION TO DISMISS

Plaintiff State of Kansas, by and through its undersigned counsel, opposes Defendant Macquarie's Motion to Dismiss.

TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................... 1

II.  SUBJECT MATTER JURISDICTION IS PROPER BASED ON MACQUARIE'S

     REGISTRATION AT THE TIME OF THE TRADE ............................................ 5

III. PLAINTIFF'S PETITION ALLEGES SUFFICIENT FACTS TO PUT DEFENDANT

     ADEQUATELY ON NOTICE OF PLAINTIFF'S CLAIMS. ................................ 7

     A.   Pleading Standard ..................................................................................... 7

     B.   Even Under the Heightened Pleading Stanard, Plaintiff Sufficiently Pled Each

          Claim Raised in Plaintiff's Petition. .................................................... 10

IV.  FERC DOES NOT PREEMPT PLAINTIFF'S CEA CLAIMS ........................... 19

     A.   Preemption Standard ............................................................................ 19

     B.   Plaintiff's Action under Federal Law is Not Preempted ....................... 19

     C.   CEA Governs Defendant's Trade ......................................................... 23

V.   CONCLUSION .................................................................................................. 25

# TABLE OF AUTHORITIES

**Cases**

*Ashcroft v. Iqbal*,
556 U.S. 678 (2009)..................................................................................................... 7, 8

*ATSI Comm., Inc. v. Shaar Fund, Ltd.*,
483 F.3d 87 (2nd Cir. 2007).............................................................................................. 14

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)............................................................................................................ 7

*BP America, Inc. v. FERC*,
52 F.4th 204 (5th Cir. 2022) ........................................................................................... 22

*Braman v. CME Group*,
149 F.Supp.3d 874 (N.D. Ill. 2015) ................................................................................ 16

*Budicak, Inc. v. Lansing Trade Grp.*,
452 F.Supp.3d 1029 ................................................................................................. passim

*Cargill Inc. v. Hardin*,
452 F.2d 1154 (8th Cir. 1971) ......................................................................................... 11

*Color. Dep't of Pub. Health v. United States*,
693 F.3d 1214 (10th Cir. 2021) ....................................................................................... 20

*Crosby v. Nat'l Foreign Trade Council*,
530 U.S. 363 (2000)......................................................................................................... 19

*Enrst & Enst v. Hochfelder*,
425 U.S. 185 (1976)............................................................................................................ 9

*Frey v. CFTC*,
931 F.2d 1171 (7th Cir. 1991) ......................................................................................... 11

*Gen. Foods Corp. v. Brannan*,
170 F.2d 220 (7th Cir. 1948) ........................................................................................... 11

*George v. Urban Settlement Servs.*,
833 F.3d 1242 (10th Cir. 2016) ......................................................................................... 8

*Hershey v. Energy Transfer Partners, L.P.*,
610 F.3d 239 (5th Cir. 2010) ............................................................................... 10, 15, 16

*Hughes v. Talen Energy Marketing*, LLC,

578 U.S. 150 (2016) ........................................................................................................ 21, 23

*In re Amaranth Natural Gas Commodities Litig.* (*Amaranth I*),
587 F. Supp. 2d 513 (S.D.N.Y. 2008) ......................................................... 9, 14, 16, 17

*In re Sumitomo Copper Litig.*,
182 F.R.D. 85 (S.D.N.Y. 1998) ............................................................................... 11

*In re Universal Serv. Fund Telephone Billing Practice Litig.*,
300 F. Supp.2d 1107 ................................................................................................ 20

*In re W. States Wholesale Nat. Gas Antitrust Litig.*,
633 F. Supp. 2d 1151, 1164 (D. Nev. 2007) ............................................................ 23

*Jones v. Rath Packing Co.,*
430 U.S. 519 (1977) ................................................................................................. 19

*Kalnit v. Eichler*,
264 F.3d 131 (2d Cir. 2001) ..................................................................................... 14

*Mississippi Power & Light Co. v. Mississippi ex rel. Moore*,
487 U.S. 354 (1988) ............................................................................................ 21, 23

*Nantahala Power & Light Co. v. Thornburg,*
476 U.S. 953 (1986) ............................................................................................ 20, 23

*O'Connor v. R.F. Lafferty & Co., Inc.,*
965 F.2d 893 (1992) ................................................................................................... 9

*OneOK, Inc. v. Learjet, Inc.*,
575 U.S. 373 (2015) ................................................................................................. 22

*Panhandle E. Pipe Line Co. v. Pub. Serv. Comm'n,*
332 U.S. 507 (1947) ................................................................................................. 22

*Sheldon v. Vermonty,*
31 F.Supp.2d 1287 (D.Kan.1998) ........................................................................ 8, 9

*Sonterra Capital Master Fund, Ltd. v. Barclays Bank PLC*,
366 F. Supp. 3d 516 (S.D.N.Y. 2018) ................................................................ 16, 17

*United States v. Borden Co.*
308 U.S. 188 (1939) ................................................................................................. 21

*United States v. Socony-Vacuum Oil Co.*,
310 U.S. 150 (1940) ................................................................................................. 11

*Williamson v. Mazda Motor of Am., Inc.*,
562 U.S. 323 (2011) ........................................................................... 19

**Statutes**

15 U.S.C. § 717(a) ............................................................................. 21

15 U.S.C. § 717(b) ............................................................................. 24

7 U.S.C. § 13a-2(8)(A) ..................................................................... 5, 6

7 U.S.C. § 25 ....................................................................................... 5

7 U.S.C. § 5 ....................................................................................... 22

7 U.S.C. § 9(3) .................................................................................. 10

Fed. R. Civ. P. 12(b)(6) ................................................................. 7, 13

Fed. R. Civ. P. 15(a)(2) ...................................................................... 7

Fed. R. Civ. P. 9(b) ........................................................................ 8, 9

**Other Authorities**

Nat'l Futures Ass'n, NFA Basic Macquarie Energy LLC, NFA,
  https://www.nfa.futures.org/BasicNet/basic-profile.aspx?nfaid=eS%2B7iR1Ia8I%3D (last
  visited Jul. 28, 2023) ...................................................................... 5

U.S. Const., Art. VI, cl. 2 ................................................................. 19

**Regulations**

17 CFR Part 3; 64 Fed. Reg. 39,912 (July 23, 1999) ......................... 5

17 C.F.R. § 180.2 .............................................................................. 10

## I.     INTRODUCTION

Winter Storm Uri hit Kansas in mid-February 2021 with extended cold weather conditions severe enough to disrupt natural gas markets. Pet. 5:4, ECF No. 1, Attachment A. Subzero temperatures increased demand for natural gas, the demand then decreased its supply, and natural gas prices rose. Pet. 26:79, ECF No. 1, Attachment A.

Natural gas benchmark prices are primarily reported through S&P Global Platts ("Platts"), a London-based price reporting agency, in *Platts Gas Daily*.[1] Benchmark index prices are based on the volume-weighted average price for qualifying transactions at a specific location. Natural gas is transacted either at a fixed price (e.g., $2.50/MMBtu) or at "index" price, which is based on a benchmark price. Pet. 16:47, ECF No. 1, Attachment A. *Platts Gas Daily* publishes an index price, daily change, high price, low price, common range, volume, and deal count for each location with trading activity over eight regions in North America. Pet. 18:56, ECF No. 1, Attachment A.

During Winter Storm Uri, spot market benchmark prices of natural gas began an extraordinary rise in Midwestern states, including Kansas. Pet. 5:4-6:4, ECF No. 1, Attachment A. Prices in certain areas rose 100-fold. Pet. 6:4, ECF No. 1, Attachment A. Over the four days of February 13-16, 2021, prices skyrocketed to benchmark prices between $200-$300/MMBtu; normal prices for natural gas just days before the storm were $2.50 MMBtu. *Id.* On February 17, 2021, spot prices for natural gas peaked at $622.785 MMBtu – nearly 250 times the normal price for natural gas in the region. Pet. 28:80, ECF No. 1, Attachment A. The rapid and historic price

---

[1] Plaintiff agrees the court may consider documents referenced in the Petition specifically, Platts Gas Daily, as it is central to Plaintiff's claim and there is no dispute regarding authenticity. Mot. Dismiss 7:2, ECF 10 and Pet. 12:36, ECF No. 1, Attachment A.

spike significantly increased the cost of natural gas for Kansas consumers both immediately following the storm and after. *Id.*

Macquarie LLC is one of the main natural gas marketers in the United States, and one of the principal marketers in Kansas. Pet. 5:2, ECF No. 1, Attachment A. Macquarie sells large volumes of natural gas, in both absolute and relative terms, to local distribution companies including gas utilities, municipal entities, power generators, and large commercial or industrial entities, and its contracts with those entities are generally obligate it to sell natural gas based on the previous day's benchmark price. *Id.* So if that benchmark is considerably higher than the price at which Macquarie can purchase gas on the actual date of the sale (whether by arms-length transaction or underpriced futures contract), Macquarie stands to receive a massive windfall. This is particularly true on days on which there is an abnormally high need among consumers for natural gas—for example, during a period of extreme low temperatures.

On February 16, 2021, during Winter Storm Uri, Macquarie entered into an economically irrational natural gas trade ('the Trade") with the Southern Star Gas Central Pipeline, ("Southern Star"), which is centered in Kansas. Macquarie made a spot purchase of natural gas, for shipment on Southern Star Gas Central Pipeline at a price so far above the prior days index price, it caused the single highest price ever paid for Southern Star gas. Macquarie's trade (the Trade") was against its short-term economic interests, because the price was far more than natural gas was trading at, in order to set an artificially high price. Macquarie then capitalized on this uneconomic trade by selling large volumes of natural gas on Southern Star reaping the benefits of the single highest index price ever paid on Southern Star.

 The February 16, 2021, Trade, which was made for February 17, 2021 delivery, exceeded all other trade prices and materially impacted the subsequent day trading price - raising

it to $622.785/MMBtu. Shortly before this storm, natural gas traded between $2.545/MMBtu and $4.030/MMBtu. Pet. 24:70, ECF No. 1, Attachment A. On February 11, 2021, prices began to climb from $9.620MMBtu to a temporary high of $329.595/MMBtu. *Id.* Macquarie's February 16, 2021 agreed price far exceeded all other trade prices and materially impacted the subsequent day's trading price—increasing it to $622.785/MMBtu. Pet. 33:99, ECF No. 1, Attachment A. The price plummeted to $44.530 *the very next day*. Pet. 33:99, ECF No. 1, Attachment A. This artificial inflation of the natural gas price during an energy emergency disconnected the price of natural gas from the ordinary forces of supply and demand and significantly boosted Macquarie's subsequent profits.

Via the Trade, Macquarie manipulated the price for Southern Star natural gas significantly, resulting in massive profits to the company on the back end—i.e., from the prices its consumers paid for gas. Pet. 36:111-37:112, ECF No. 1, Attachment A. In fact, the Trade brought in so much revenue that, in 2021, Macquarie quadrupled its parent company's usual profits, almost solely due to Macquarie's market manipulation. Pet. 42:126, ECF No. 1, Attachment A. Some reports have estimated Macquarie's trading activities around Winter Storm Uri to be over $650 million.[2]

While extreme profit is not, in and of itself, illegal, Macquarie generated its tremendous profits by illegally exploiting an easily manipulated market. Pet. 37:112-45:135, ECF No. 1, Attachment A. Prices for any given day on the Southern Star pipeline are based on the volume-weighted average price of all prior-day, fixed-price transactions. Pet. 5:3, ECF No. 1,

---

[2] SGT Investigates Macquarie Energy LLC for Alleged Natural Gas Market Manipulation, https://www.sgtlaw.com/media/press-releases/2023-03-22-sgt-investigates-macquarie-energy-llc-for-alleged-natural-gas-market-manipulation#:~:text=Macquarie's%20trading%20activities%20in%20and,enormous%20windfall%20for%20the%20company., last accessed July 26, 2023)

Attachment A. Due to Southern Star's relatively small number of qualifying transactions each day, the next-day price is highly sensitive to high-volume or high-priced transactions. Pet. 27:75, ECF No. 1, Attachment A. For example, the Southern Star price on February 16, 2021, was based on just seven qualifying transactions. Pet. 27:77, ECF No. 1, Attachment A. The February 17, 2021, price, manipulated by Macquarie's actions, was established by only two transactions. *Id.* A single exceptional—and economically illogical—transaction on Southern Star was sufficient to nearly double the daily price from February 16 to February 17, 2021. This single trade—which, remember, was made by Macquarie itself—allowed the company to reap exceptional monetary benefits on the backs of other market participants, the people of Kansas, and the State of Kansas itself. Pet. 45:136-46:139, ECF No. 1, Attachment A. Such intentional and artificial price manipulation violates the Commodity Exchange Act ("CEA"). Pet. 45:133, ECF No. 1, Attachment A.

Following Winter Storm Uri's exceptional gas pricing event, market participants and observers repeatedly expressed concerns about the manipulation of natural gas pricing and specifically identified the February 17, 2021, Southern Star Gas Daily price in particular as the locus of potential manipulation. Pet. 7:11, ECF No. 1, Attachment A. The State opened an investigation into price manipulation, which ultimately led it to issue Macquarie a subpoena on August 18, 2022. Pet. for Enforcement of Subpoena and Memorandum in Support at 19-20, *Kansas v. Macquarie Energy LLC*, No. 2022-cv-000677 (Dist. Ct. of Shawnee Cnty. Nov. 4, 2022). In that case, the State is seeking a court order to force Macquarie to fully comply with that subpoena. *Id.* At 31. The State brought the present action based on its investigation, including Macquarie's partial response to the subpoena. Pet. 4, ECF No. 1, Attachment A.

## II.      SUBJECT MATTER JURISDICTION IS PROPER BASED ON MACQUARIE'S REGISTRATION AT THE TIME OF THE TRADE

Defendant claims Plaintiff does not and cannot allege Defendant is registered under the CEA. Defendant conveniently omits important facts regarding the truth of its registration. Mot. Dismiss 3-4, 10.

Defendant correctly asserts it is not currently registered with the CFTC in compliance with the CEA; however, Defendant fails to note the company <u>was registered with the CFTC at the time it made the Trade</u>. Mot. Dismiss 4, ECF No. 10 and Nat'l Futures Ass'n, NFA Basic Macquarie Energy LLC, NFA, https://www.nfa.futures.org/BasicNet/basic-profile.aspx?nfaid=eS%2B7iR1Ia8I%3D (last visited Jul. 28, 2023). Defendant was registered with the CFTC at the time it allegedly manipulated the market for natural gas. Nat'l Futures Ass'n, *supra*. Defendant withdrew its registration as a swap dealer just a few weeks after the Defendant placed the Trade that serves as the basis for this action. *Id.* The CFTC has delegated its registration responsibility to The National Futures Association ("NFA") 17 CFR Part 3; 64 Fed. Reg. 39,912 (July 23, 1999). Defendant registered with the NFA as a provisional swap dealer on December 31, 2012, and filed a withdrawal of its registration on April 29, 2021 - just 71 days after the Trade in question. *Id.* The National Futures Association ("NFA") granted the withdrawal request on May 29, 2021. *Id.*

Defendant's registration at the time of the Trade is sufficient for Plaintiff to establish subject-matter jurisdiction. As Defendant notes, 7 U.S.C. § 25 provides for exclusive federal-court jurisdiction to resolve claims brought under that section of the CEA. Mot. Dismiss 10. But this exclusivity is modified by 7 U.S.C. § 13a-2(8)(A), which allows an "authorized State official" to proceed in state court against "any person registered under [the CEA] . . . for an alleged violation of any antifraud provision of this chapter or any antifraud rule, regulation, or

order issued pursuant to the chapter." This statute preserves states' traditional freedom to protect themselves and their citizens:

> Whenever it shall appear to the attorney general of any State . . . that the interests of the residents of that State have been . . . adversely affected because any person . . . has engaged in, is engaging or is about to engage in, any act or practice constituting a violation . . . the State may bring a suit . . . to obtain damages on behalf of their residents, or to obtain such further and other relief as the court may deem appropriate.

*Id.* § 13a-2(1). While 13a-2(2) empowers the States to bring such action in federal court, 13a-2(8) makes it clear Congress did not intend to deny the States from bringing actions in their own courts: "[n]othing in this chapter shall prohibit an authorized State official from proceeding in a State court . . ." Thus, 13a-2 is crafted to ensure States have an expansive role in the enforcement of the CEA.

In providing for States to pursue action in state court for violations of the CEA antifraud provisions, the statute offers no exemption to an entity that chose to withdraw its registration. To add a requirement that the person be registered at the time of suit, rather than at the time of the offending conduct, would be to add new language and meaning to the statute. Specifically, such an interpretation would require the addition of the words "at the time of suit" after "any person registered." This Court should only give effect to the language in the statute, which grants the state court subject matter jurisdiction if the defendant was registered at the time the cause of action arose. NFA registration rule 601(e) further supports jurisdiction: "Withdrawal from registration does not constitute a release from liability for any violation of the Act or any rule, regulation or order thereunder, which occurred while a person was registered."

Any alternate interpretation would render 13a-2(8) nearly meaningless. If the only test of jurisdiction was whether the Defendant was registered at the time of suit, then any defendant could avoid state court jurisdiction by merely withdrawing its registration after committing

misconduct, in anticipation of a state court action. Then, after court action was filed or completed, the defendant could simply re-register with the CFTC, having avoided responsibility and liability for their actions. Such gamesmanship is contrary with the State authority contemplated by a full reading of 13a-2, and would effectively render the government incapable of enforcing the law in its own courts. This Court should interpret 13a-2(8) to mean that the Defendant was required to be registered at the time of the injury, rather than the time of suit.

The Plaintiff did fail to include the allegation of Defendant's registration at the time of injury in the Petition. However, if the Court finds this pleading imperative, Plaintiff can resolve the issue by amending the petition. The facts are there. *See supra*. Defendant's attempt to get this case dismissed on something so easily cured (rather than simply confer and allow amendment to add allegations they must know to be true) reeks of gamesmanship. If the lack of such an allegation is truly a fatal flaw, this Court should grant leave for the Plaintiff to amend the petition, as justice requires. *See* Fed. R. Civ. P. 15(a)(2).

### III. PLAINTIFF'S PETITION ALLEGES SUFFICIENT FACTS TO PUT DEFENDANT ADEQUATELY ON NOTICE OF PLAINTIFF'S CLAIMS.

#### A. *Pleading Standard*

To survive a motion to dismiss brought pursuant to Fed. R. Civ. P. 12(b)(6), a complaint must contain factual allegations that, assumed to be true, "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The complaint must also include "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. The **plausibility** standard does not require a showing of **probability** that "a defendant has acted unlawfully," but requires "more than a sheer possibility." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Importantly, the court must accept the nonmoving party's factual allegations as true, and may not dismiss the case on the ground that it appears unlikely that the allegations can be

proven. *Id.* at 678. In other words, if the court finds itself entertaining alternate, innocent explanations for the facts alleged in the complaint, it's doing things wrong. The question for the Court is not whether liability is the best or most likely consequence of the facts alleged; the question is merely whether liability is a *plausible* consequence of the facts alleged.

The Supreme Court has explained the analysis of a Rule 12(b)(6) motion as a two-step process. For the purposes of a motion to dismiss, the court "must take all the factual allegations in the complaint as true, [but is] 'not bound to accept as true a legal conclusion couched as a factual allegation.'" *Iqbal*, 556 U.S. at 678. Thus, the court must first determine if the allegations are factual and entitled to an assumption of truth, or merely legal conclusions that are not entitled to an assumption of truth. *Id.* at 678–79. Then the court must determine whether the factual allegations, when assumed true, "plausibly give rise to an entitlement to relief." *Id.* at 679. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678.

Defendant's invocation of a heightened pleading standard is incorrect. Mot. Dismiss 11, ECF No. 10. Fed. R. Civ. P. 9(b) requires that when a claim sounds in fraud or mistake, a party must state "with particularity the circumstances constituting fraud or mistake." But "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *Id.* "Rule 9(b)'s purpose is to afford a defendant fair notice of a plaintiff's claims and the factual grounds supporting those claims." *George v. Urban Settlement Servs.*, 833 F.3d 1242, 1254 (10th Cir. 2016) (internal quotes omitted).

Defendant incorrectly cites *Sheldon v. Vermonty,* 31 F.Supp.2d 1287 (D.Kan.1998) to support its position that the allowance for intent to be generally pled is somehow not applicable in this case. Mot. Dismiss 12, ECF No. 10. First, *Sheldon* dealt with alleged violations of the

Securities and Exchange Act of 1934, not the Commodity Exchange Act. *Id* at 1290. Second, the *Sheldon* court cabined in its modification of 9(b) to securities actions. ("Although Rule 9(b) allows "state of mind" to be pled generally, courts have long imposed stringent requirements with respect to pleading defendant's intent to defraud in securities actions.") *Id.* at 1292 (emphasis added).

This cabining is supported by the cases cited by the *Sheldon* court. First, the *Sheldon* court cites *Enrst & Enst v. Hochfelder*, 425 U.S. 185 (1976), which does not address the general rules of civil procedure and instead focuses its analysis on the history of the Securities and Exchange Act. Likewise, *O'Connor v. R.F. Lafferty & Co., Inc.,* 965 F.2d 893 (1992), the second case cited by the *Sheldon* court, cites *Enrst* for the position that actions under certain portions of the Securities and Exchange Act require specific pleading of intent. *Id at* 899. As Plaintiff's action arises under the CEA, and not the Securities & Exchange Act, *Sheldon*'s limited modification of Fed. R. Civ. P. 9(b) does not apply. Defendant cites no case demonstrating the text of 9(b) has been modified for the CEA, and thus, Defendant's argument should be rejected.

Instead, this Court should adopt the analysis of the court in *Budicak, Inc. v. Lansing Trade Grp.,* 452 F.Supp.3d 1029. There, the court noted that in a manipulation-based CEA claim, such in this case, the 9(b) standard is typically relaxed, and simply requires a complaint to describe "what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue". *Id* at 1046 (quoting *In re Nat. Gas Commodity Litig.*, 358 F. Supp. 2d 336, 343 (S.D.N.Y. 2005)). Furthermore, that court held the complaint must merely contain facts that "give rise to a strong inference of scienter." *Id* at 1046 (quoting *In re Amaranth Nat. Gas Commodities Litig.*, 612 F. Supp. 2d 376, 384 (S.D.N.Y. 2009)).

**B.** *Even Under the Heightened Pleading Standard, Plaintiff Sufficiently Pled Each Claim Raised in Plaintiff's Petition.*

Plaintiff alleges Defendant impacted the price of natural gas through direct manipulation, usage of a manipulative and deceptive device, fraud, or misrepresentation, and further engaged in illegal or prohibited transactions. Pet. 45:135-46:142, ECF No. 1, Attachment A. While Defendant chooses to effectively ignore numerous claims raised by the Petition by declaring those claims as "inapplicable" in a footnote, Plaintiff will address each claim asserted in the petition.

As an initial matter, Defendant argues Plaintiff fails to allege claims under 7 U.S.C. 9(2). Mot. Dismiss 12, ECF No. 10. Plaintiff agrees, as Plaintiff is not alleging violations of 9(2).

Plaintiff asserts Defendant manipulated the price of natural gas through intentional or reckless conduct by making the Trade, in violation of 7 U.S.C. § 9(3) and 17 C.F.R. § 180.2. Pet. 45:135, ECF No. 1, Attachment A. Specifically, 7 U.S.C §9(3) prohibits "any person, directly or indirectly, to manipulate or attempt to manipulate the price of any swap, or of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity." Section 180.2 mirrors this section.

There are four elements to a CEA claim for price manipulation: "'(1) Defendants possessed an ability to influence market prices; (2) an artificial price existed; (3) Defendants caused the artificial prices; and (4) Defendants specifically intended to cause the artificial price.'" *Budicak*, 452 F. Supp. 3d at 1046 (quoting *Hershey v. Energy Transfer Partners, L.P.*, 610 F.3d 239, 247 (5th Cir. 2010)).

The State adequately alleged all four of these elements. Defendant's challenge runs mainly to the second and fourth elements—i.e., the sufficiency of the artificial price allegation

and that Defendant specifically intended to cause the artificial price. Mot. Dismiss 17, ECF No. 10. [3]

With respect to the artificiality of the price, Plaintiff has sufficiently alleged the mechanics of Defendant's artificial price. To plead manipulation, a plaintiff must allege the existence of an artificial price in the commodity at issue. An artificial price is a price that "does not reflect basic forces of supply and demand." *Cargill Inc. v. Hardin*, 452 F.2d 1154, 1163 (8th Cir. 1971); *accord Frey v. CFTC*, 931 F.2d 1171, 1175 (7th Cir. 1991); *see also Gen. Foods Corp. v. Brannan*, 170 F.2d 220, 231 (7th Cir. 1948) (defining manipulation as "the creation of an artificial price by planned action, whether by one man or a group of men").

"[M]arket manipulation in its various manifestations is implicitly an artificial stimulus applied to (or at times a brake on) market prices, a force which distorts those prices, a factor which prevents the determination of those prices by free competition alone." *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 223 (1940). To determine the existence of an artificial price, a court may consider the underlying commodity's normal market forces, historical prices, supply and demand factors, price spreads, and the cash market for the commodity at issue. *Budicak*, 452 F.Supp.3d at 1047 (citing *In re Sumitomo Copper Litig.*, 182 F.R.D. 85, 90 n.6 (S.D.N.Y. 1998)).

In its Petition, Plaintiff alleges the price changes on the Southern Star pipeline immediately before, during, and after Winter Storm Uri and during the state of emergency. Pet. 24:70-28:79, ECF No. 1, Attachment A. Shortly before the natural gas market anticipated increased demand during Winter Storm Uri, gas traded between $2.545/MMBtu and

---

[3] Although Defendant does not specifically challenge the other elements, it's worth noting that the petition does make a plausible case on the ability to influence market prices and that Defendant's actions caused an artificial price. *See* Pet. ¶¶ 22, 24, 74–79, 82, 86, 89–94, 101–06.

$4.030/MMBtu. *Id*. On February 11, 2021, prices began to climb from $9.620MMBtu to a temporary high of $329.595/MMBtu. *Id*. Plaintiff alleged Defendant's Trade spiked the price to the highest price in Southern Star history of $622.785/MMBtu, which swiftly fell to $44.530 the following day. Pet. ¶¶ 70, 90, 91, 92. Further, Plaintiff alleged the market price for other market participants, namely the Other Trade reported to Southern Star on February 16, 2021, reflected a price similar to the existing market rate. Pet. ¶¶ 92, 94. Furthermore, the petition alleges that Defendant actually acquired natural gas at rates much lower than the rate articulated in the Trade *on the very day Defendant made the Trade*. Pet. ¶ 94. Taken as a whole, Plaintiff alleges facts that the market rate at the time of the Trade was considerably lower than the amount Defendant accepted in the Trade. The Southern Star and Other Trade allegations demonstrate the supply and demand forces on the market established a lower natural gas price and only Defendant established a substantially higher price, through its own actions. Furthermore, the artificiality of the price is bolstered by the many stakeholders in the Kansas natural gas community who expressed concerns about the Southern Star index price on February 17, 2021, Pet. ¶¶ 96–100.

In sum, the State alleges that (a) the market forces during Winter Storm Uri drastically increased the price of natural gas up to over $300/MMBtu; (b) no unreported trade in the Plaintiff's knowledge is in line with Defendant's trade price; (c) Defendant's trade price is the only trade reported to reflect such a high price; (d) the only other trade reported at the time was more in line with the market rate previously reported for Southern Star trades; and (e) Defendant acquired natural gas at a rate lower than Defendant's trade price on the day of the Trade. Taken as true, this demonstrates Defendant's trade price was artificial and outside the normal forces of supply and demand.

Defendant's assertions that hidden, unreported trades or other forces may have caused the price to increase in line with Defendant's trade price should be unpersuasive. Mot. Dismiss 18-19, ECF No. 10. First and foremost, this argument is inappropriate in the Rule 12(b)(6) context. All Defendant is presenting is an alternate explanation for the same facts. That is a question for a jury, not something to be dealt with at the pleading stage.

But even if the Court considers Defendant's arguments, they still do not provide substantial reason to dismiss the case. Only reported sales impact the Platts price for Southern Star. Mot. Dismiss 6, ECF No. 10. On the day in question, there were two trades reported, one by Defendant, and one Other Trade. The one Other Trade reported was more in line with market forces. If Defendant's hidden or unreported trade theory were accurate, the market forces would have impacted the Other Trade in the same manner as Defendant's trade price, making the Other Trade closer in price to Defendant's Trade. Also, Defendant's claim that the State does not allege facts about the market conditions is false. Mot. Dismiss 19, ECF No. 10. Plaintiff asserted that Winter Storm Uri significantly impacted supply and demand, and such impacts were reflected in the over $300/MMBtu price. Regardless of the market forces, Defendant sought and received a price nearly double the February 16, 2021 price and over ten times the February 18, 2021 price.

Defendant presents itself as merely a market player accepting a price offered, as if it had no role in setting the sole, record-breaking trade price. Mot. Dismiss 17-18, ECF No. 10. Such a defense is an argument for summary judgment or trial. Even if Defendant can later prove this assertion to be true, at the motion to dismiss stage, Plaintiff's allegations of an artificial price are sufficient to survive a motion to dismiss.

Finally, Plaintiff sufficiently alleged Defendant's intentional or reckless behavior in setting a manipulated price for natural gas. Scienter, in relation to commodities fraud, is "the

intent to deceive, manipulate, or defraud." *In re Amaranth Natural Gas Commodities Litig.* (*Amaranth I*), 587 F. Supp. 2d 513, 529 (S.D.N.Y. 2008). While Plaintiff has not pled any specific communications demonstrating scienter, scienter can be pled by "'alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness.'" *Id.* (quoting *ATSI Comm., Inc. v. Shaar Fund, Ltd.*, 483 F.3d 87, 99 (2nd Cir. 2007)). "'Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater.'" *Id.* (quoting *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001)). Under this demonstration of scienter, plaintiff must allege facts showing that the defendant's conduct is "'at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *Id.* (quoting *Kalnit*, 264 F.3d at 142). Thus, an express allegation of deliberate misconduct can be sufficient to plead scienter. *Id.*

Under the above framework, Plaintiff has sufficiently alleged the intentionality element. Plaintiff alleged Defendant had sufficient motive to manipulate price because Defendant is a net seller of physical natural gas. Pet. ¶ 107. Defendant would, and in fact did, receive a significant financial benefit when natural gas prices unnaturally reached before unseen prices. Pet. ¶ 109. More specifically, Plaintiff alleged Defendant maneuvered the company's holdings to ensure it was a net seller on the day it spiked the natural gas prices. Pet. ¶ 108. Furthermore, Defendant had the opportunity to manipulate and benefit from a higher price of natural gas. Pet. ¶¶ 107, 111. As a net seller of natural gas on February 17, 2021, Defendant would materially benefit

from each increase in price it could effectuate in the market even if it took a loss on the Trade; and so long as the ratio between sales and purchases was sufficiently high it could guarantee itself large profits with even a small over-market manipulation.[4] As the market forces outside of Macquarie's actions do not suggest such a massive price spike was dictated by supply and demand, or was economically advantageous for anyone other than Defendant, Defendant's price spike and subsequent reaping of the profits represent circumstantial evidence of intentionality. When taken as a whole, Plaintiff's petition gives a strong inference, which this Court is allowed to draw, that Defendant acted either intentionally or recklessly.

Defendant's reliance on *Hershey v. Energy Transfer Partners, L.P.* is misplaced. In *Hershey*, the Plaintiff's allegations involved a tenuous causal link in which supply increases of natural gas upstream from a distribution hub negatively impacted the prices at a specific distribution hub. 610 F.3d at 248. The *Hershey* plaintiffs stacked inference upon inference, attempting to create an "intentional and inevitable" chain of conduct that lowered the price. *Id*. But the court noted a disconnect in the allegations: the financial benefit could not occur if the plaintiff's alleged price suppression was taken as true; the defendant in that case could not have received a financial benefit and could only have unintentionally harmed the specific distribution hub. *Id*. at 249. With those facts, the court held Plaintiff's circumstantial evidence did not show an intent to lower prices.

Here, in contrast, the connection to Defendants' financial benefit is direct and understandable. Plaintiff alleges a direct manipulation of the Southern Star index pricing by Defendant's actions, something that was not alleged in *Hershey*. Further, Plaintiff alleges that Defendant would and actually did benefit from the price manipulation.

---

[4] As it turned out, Defendant decided "in for a penny, in for a pound" and decided to use massive manipulation to reap correspondingly massive profits.

This case is more like *Amaranth I*, 587 F.Supp.2d at 539–44. In that case, the plaintiffs alleged the defendants conspired to drive up prices on a particular exchange and sell natural gas futures at a loss while making a net profit on the swaps. The alleged manipulations were targeted to immediately and directly benefit the *Amaranth* Defendants' transactions on the specific exchange. Likewise, in this case, Plaintiff alleges that Defendant targeted a specific hub, manipulated the prices to create a net benefit for the Defendant, which would exist even if they took a loss on the Trade, because they knew the overall scheme would result in a net gain for Defendant. Plaintiff's allegations are more like *Amaranth* than *Hershey*, and the *Amaranth* court held the allegations to be sufficient to prove intentionality.

Likewise, the other examples cited by Defendant are distinguishable from Plaintiff's allegations. In *Braman v. CME Group*, 149 F.Supp.3d 874 (N.D. Ill. 2015), the plaintiffs generally alleged that the defendant's high-frequency trading market allowed manipulation. *Id.* at 884–85. The court noted that there was no allegation of any artificial price, and only generally alleged the possibility of misconduct on their platform. *Id*. at 889. The *Braman* plaintiffs failed to allege any conduct that would have caused a price fluctuation. *Id*. Unlike in that case, the State here has identified a specific artificial price, articulated specific conduct that caused the price, identified a specific motive and opportunity for Defendant to benefit from the price, and the actual benefit Defendant received from the artificial price. Plaintiffs made specific allegations showing the how and the why of Defendant's price manipulation scheme.

*Sonterra Capital Master Fund, Ltd. v. Barclays Bank PLC*, 366 F. Supp. 3d 516 (S.D.N.Y. 2018), which is relied on by Defendant, is also not analogous. In that case, the plaintiffs alleged manipulation of a market in which prices are determined by averaging a number of survey estimates. *Id*. at 518. They claimed that because certain banks were sharing

information from which their potential survey answers could be derived, there was necessarily a conspiracy to fix futures contracts of the same commodity. *Id*. at 519–20. But the court found that it was implausible that this alleged conspiracy was motivated by "a common motive to increase profits through manipulation" *Id.* at 553; and there was no allegation of "conscious misbehavior or recklessness" *Id.* at 554. Furthermore—and importantly—there was no obvious connection between the alleged collusive behavior and the alleged artificial price: the instruments whose price were allegedly inflated were "not even tied to the benchmark [the d]efendants allegedly manipulated." *Id.* So, without further allegations to connect the dots, the court was left with an implausible theory of liability.

Plaintiff alleges Defendant undertook one reported trade to drastically, and uneconomically, increase the price of natural gas on Southern Star, which directly lead to a windfall for Defendant. Here, the State alleges a profit motive is a factor to support Defendant's intentionality. Macquarie does not contest it made the Trade. Mot. Dismiss 3. Plaintiff alleged the market was already substantially elevated at the time of Defendant's trade. Plaintiff points to specific Defendant actions positioning itself as a net seller on February 17, 2021, showing Defendant would drastically increase its profits well above what the market would have otherwise generated. These profits are evidence of Defendant's intent to use its power to spike natural gas prices. Defendant's motive was to exploit a disaster, its market power, and its market position, to illegally manipulate the price of natural gas and extract more value than the market would otherwise allow.

Finally, Defendant's declaration of lack of evidence of intent should be non-persuasive. Mot. Dismiss 19, ECF No. 10. Given the analysis of *Amaranth I*, Plaintiff meets the burden of sufficient evidence of intent when it points to the Defendant's circumstantial demonstrations of

specific motive and opportunity to manipulate the market. The strong inference of intent or reckless behavior is sufficient.

Plaintiff's Petition sets out Defendant's motive to exploit its net seller position to extract value from a disaster beyond what the market would support. Plaintiff's allegations show that February 17, 2021 was, in fact, the last day Defendant could exploit its position and it did so with an eager, manipulative trade on February 16, 2021. Pet. 107-109, 136.Further, as outlined in the Petition, Defendant positioned itself to benefit from such exploitation and had opportunity to manipulate the market with its transaction on February 16, 2021. These allegations, when taken in whole, show a strong inference of intentional or reckless action on Defendant's part. Plaintiff has alleged sufficient facts to meet the *Budicak* fourth element.

Plaintiff has adequately alleged the "who, what, when, where, and why" of Defendant's conduct. Therefore, Plaintiff has met the heightened pleading standard for its claims under §§ 9(3) and 180.2.

To facilitate analysis of this point, Plaintiff will address §§ 9(3) and 180.2 first; however, as an initial matter, the Court should reject Defendant's perfunctory statement regarding the antifraud nature of §§ 9(3) and 180.2. Defendant offers no argument, case law, analysis, or support beyond the bare statement that such laws are not "antifraud." The *Budicak* opinion is again illustrative. While *Budicak* does not cite 9(3), the language of CEA Section 9(b) is identical to the prohibition in 9(3), as the *Budicak* court points out. *Id*. at 1046. In the next sentence, the court explains, "[t]o adequately allege fraud or mistake under Rule 9(b), 'a party must state with particularity the circumstances constituting fraud or mistake.'"

The Court continues, [i]n manipulation-based CEA claims, the Rule 9(b) standard is typically relaxed, and simply requires a complaint to describe "what manipulative acts were

performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue." Although Rule 9(b) permits plaintiffs to allege scienter generally, the complaint must contain facts that "give rise to a strong inference of scienter." This Court should adopt the *Budicak* approach in recognizing the similarities in language and analysis, and reject Defendant's bare assertion.

## IV.    FERC DOES NOT PREEMPT PLAINTIFF'S CEA CLAIMS

### A.    *Preemption Standard*

Defendant raises a conflict-preemption argument to Plaintiff's use of the CEA to pursue the present case. Mot. Dismiss 22-24, ECF No. 10. Conflict preemption exists when the challenged state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000) (quotations omitted), or "to the accomplishment of a significant federal regulatory objective," *Williamson v. Mazda Motor of Am., Inc.*, 562 U.S. 323, 330 (2011). In deciding whether conflict preemption applies in a given case, a court must "consider the relationship between state and federal laws as they are interpreted and applied, not merely as they are written." *Jones v. Rath Packing Co.,* 430 U.S. 519, 526 (1977).

### B.    *Plaintiff's Action under Federal Law is Not Preempted*

Plaintiff's action under the CEA is proper, and not preempted by the Natural Gas Act ("NGA"), because no state law exists with which federal law conflicts. At its core, a preemption argument arises under the Supremacy Clause of the United States Constitution. The Supremacy Clause provides that federal law "shall be the supreme Law of the Land ... any Thing in the Constitution or Laws of any state to the Contrary notwithstanding." U.S. Const., Art. VI, cl. 2.

Federal law only preempts *state* law; every case Defendant cites to demonstrate preemption specifically refers to a conflict between state law and federal law. *See Color. Dep't of Pub. Health v. United States*, 693 F.3d 1214, 1223 (10th Cir. 2021) ("when a federal law expressly preempts *state law* . . . to the extent that a *state law* conflicts with federal law" [emphasis added]), *see also In re Universal Serv. Fund Telephone Billing Practice Litig.*, 300 F. Supp.2d 1107, 1118.

In the matter before this Court, Defendant has not and cannot point to a state law which could be preempted by the NGA. Rather, Defendant tries to port preemption onto the situation we have here: a state official suing to enforce federal law. But he cites no authority for applying preemption in this way and undersigned counsel is not aware of any such authority either. The concept does not even make logical sense; despite Plaintiff being a state official, it is still ultimately attempting to enforce *federal* law. Nor does Defendant cite any authority suggesting that a state, acting under the express authority of the CEA and seeking only to enforce federal law, conflicts with the Federal Energy Regulatory Commission's ("FERC") authority under the NGA. Each case on which Defendant relies involves a state asserting or utilizing authority under the color of <u>state</u> law, not under the color of general federal law nor under the CEA specifically.

In *Nantahala Power & Light Co. v. Thornburg,* 476 U.S. 953 (1986), North Carolina imposed a rate making order that expressly conflicted with a similar rate making order by FERC. FERC's authority preempted North Carolina's ability to independently set rates. *Nantahala Power* deals with retail power rates, rather than intermediate natural gas sales, and involved a situation where FERC expressly approved the rates at issue. *See Id.* at 960-61, 66-67. *Nantahala Power* has no bearing on whether a CEA action is preempted by the NGA.

Likewise, *Mississippi Power & Light Co. v. Mississippi ex rel. Moore*, 487 U.S. 354

(1988) has no applicability as the case turned on the State utilizing its regulatory authority under

the color of state law to interfere with utility rates FERC set. In the action before this Court, no

state law or action interferes with FERC established wholesale rates.

Defendant's reliance on *Hughes v. Talen Energy Marketing*, LLC, 578 U.S. 150 (2016) is

equally flawed. Mot. Dismiss 24-25, ECF No. 10. Similar to *Mississippi Power & Light*, *Hughes*

involved a state acting under the color of state law to impact FERC-determined wholesale rates.

*Id*. at 163. *Nantahala Power, Mississippi Power & Light*, and *Hughes* do not support

Defendant's position that this action is preempted when the Plaintiff alleges violations solely

under the CEA.

Plaintiff is acting with the authority the *federal* Congress granted it under the CEA.

Preemption has nothing to do with it.

### C.     Plaintiff's Action is Proper, as the CEA and NGA Do Not Conflict

Ordinary cannons of construction also support Plaintiff's position that both the CEA and

NGA operate without conflict. "It is a cardinal principle of construction that repeals by

implication are not favored. When there are two acts upon the same subject, the rule is to give

effect to both if possible." *United States v. Borden Co.* 308 U.S. 188, 198 (1939) (internal

citations omitted). Both the NGA and CEA operate in trading and markets of natural gas, and

neither law conflicts with the other.

"The NGA and the CEA address different, though at times related, spheres. Whereas the

NGA aims to protect the public interest in the interstate transport and sale of natural gas destined

for distribution to the general public, *see* 15 U.S.C. § 717(a), the CEA safeguards the public

interest in the integrity of the commodity futures markets. "[It is] . . . the purpose of this chapter

to deter and prevent price manipulation or any other disruptions to market integrity; . . . to protect all market participants from fraudulent or other abusive sales practices . . . " *See* 7 U.S.C. § 5.  Furthermore, the NGA "'was drawn with meticulous regard for the continued exercise of state power, not to handicap or dilute it in any way.'" *OneOK, Inc. v. Learjet, Inc.*, 575 U.S. 373, 388 (2015) (quoting *Panhandle E. Pipe Line Co. v. Pub. Serv. Comm'n*, 332 U.S. 507, 517–18 (1947)).

*OneOK* offers an illustrative analysis when applied to the facts of this case. The plaintiffs in *OneOK* asserted antitrust violations under various state antitrust laws. The *OneOK* court identifies how the different nature of the plaintiffs' actions and the underlying laws save the case from preemption. "[R]espondents' state antitrust lawsuits do not seek to challenge the reasonableness of any rates expressly approved by FERC. Rather, they seek to challenge the background marketplace conditions that affected both jurisdictional and nonjurisdictional rates." *Id*. at 389.

As the plaintiff did in *OneOK*, the Plaintiff in this case addresses marketplace conditions and not the reasonableness of any given price, or the fairness of a rate set or approved by FERC. Here, Defendant faces CEA liability for its successful manipulation of the market, regardless of the price it ultimately charged its customers. Plaintiff offers the allegations of the uneconomic price negotiated by Defendant not to argue the price is unreasonable, but instead to demonstrate evidence of the Defendant's intentional market manipulation. The *OneOK* holding supports this Court finding that a CEA action for a related price manipulation purpose does not conflict with the NGA.

Defendant cites to *BP America, Inc. v. FERC*, 52 F.4th 204 (5th Cir. 2022), to support its claim that the CEA and FERC conflict on price manipulation. Mot. Dismiss 25, ECF No. 10.

However, nothing in the *BP* case suggests the CEA and NGA are conflicting statutes. The *BP*

court never suggests that FERC is the sole agency to prohibit price manipulation. There is no

express conflict between the CEA action the State has brought here and the NGA, the Court

should find Plaintiff's action under the CEA is proper.

### C. CEA Governs Defendant's Trade

Defendant's sole argument of FERC's NGA authority conflicting with Plaintiff's case is

Defendant's claim that FERC approved its pricing action with blanket certificate authority. Mot.

Dismiss 22-23, ECF No. 10. As an initial matter, the blanket certificate authority presents a

substantively different pricing scenario than those presented in *Nantahala Power, Mississippi*

*Power & Light*, or *Hughes.*

> As a result of various changes in the natural gas industry, including Congressional
> legislation aimed at deregulation, FERC decided, pursuant to its authority under
> section seven of the NGA, to issue blanket certificates allowing pipelines and other
> persons selling natural gas to make wholesale sales at negotiated or market-based
> rates. The purpose of the blanket certificates was to "foster a truly competitive
> market for natural gas sales for resale in interstate commerce, giving purchasers of
> natural gas access to multiple sources of natural gas and the opportunity to make
> gas purchasing decisions in accord with market conditions." These "blanket
> certificates were issued by operation of the rule itself and there was no requirement
> for persons to file applications seeking such authorization.

*In re W. States Wholesale Nat. Gas Antitrust Litig.*, 633 F. Supp. 2d 1151, 1164 (D. Nev. 2007)

(internal citations omitted).

In the cases cited by the Defendant, each regulated entity filed a rate with FERC and the

states attempted to interfere with that expressly approved rate. This is in direct contrast with the

natural gas arena in which FERC has allowed the market to control pricing.

Contrary to Defendant's imaginative contention, FERC **never found** that Defendant's

price was a just and reasonable market price. Mot. Dismiss 26, ECF No. 10. In November 2021,

FERC released a 316-page final report on Winter Storm Uri and the utility interruptions caused

by the event.[5] In all 316 pages of its report, FERC only mentions price 21 times. Macquarie appears precisely **zero** times in the report. To indicate to the Court that their "price" was "FERC-approved" (Mot. Dismiss p. 4) is disingenuous.  FERC's report made no mention of Macquarie, yet Defendant intimates to this Court that FERC made a "finding that such price was a just and reasonable market price." *Id*. In fact, in 2022, FERC Chairman Richard Glick advised that FERC found some "anomalies" in natural gas pricing during Winter Storm Uri that may have been from market manipulation, which FERC was investigating at the time.[6] As FERC has made **no finding** about Macquarie's trade, the Court should reject Defendant's argument that Plaintiff's action conflicts with an existing FERC approval of Defendant's specific pricing during Winter Storm Uri.

Defendant raises no factual assertions or legal analysis to suggest that the February 16, 2021 trade is the type of trade governed by FERC. Any determination about the applicability of the NGA to the February 16, 2021, transaction will turn of the facts surrounding the nature of the trade and Defendant's purpose for acquiring natural gas. The NGA applies "to the sale in interstate commerce of natural gas for resale for ultimate public consumption for domestic, commercial, industrial, or any other use." 15 U.S.C. § 717(b). The NGA does not apply to any general natural gas transaction or to local distribution of natural gas. *Id*. As the NGA does not apply generally to all natural gas sales, the applicability of the statute is a factual determination based on the purpose of the transaction. Thus, analysis on the point is better suited for resolution after discovery is complete. Therefore, the Court should reject Defendant's motion to dismiss.

---

[5] https://www.ferc.gov/media/february-2021-cold-weather-outages-texas-and-south-central-united-states-ferc-nerc-and
[6] https://www.naturalgasintel.com/ferc-still-probing-potential-natural-gas-market-manipulation-during-winter-storm-uri/

## V.    CONCLUSION

For the above stated reasons, the State of Kansas respectfully requests the Court deny

Defendant's Motion to Dismiss. In the alternative, if the Court determines there are deficiencies

in Plaintiff's petition, Plaintiff requests leave to file an amended complaint, correcting any

deficiency.

Dated: July 28th, 2023.

Respectfully submitted,

*Frances R. Oleen*
Frances R. Oleen, Kan. Sup. Ct. #17433
Office of Kansas Attorney General
120 S.W. 10th Ave, 2nd Floor
Topeka, KS 66612-1597
Phone (785) 296-3751
fran.oleen@ag.ks.gov

*Attorney for Plaintiff*

### Certificate of Service

The undersigned hereby certifies that on this 28th day of July, 2023, a true and correct

copy of the above and foregoing was e-filed with the Court's CM/ECF electronic filing system,

which provided notice to all parties who have entered an appearance in this action.

Frances R. Oleen
*For Plaintiff*
