## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

THE STATE OF KANSAS, ex rel., KRIS
W. KOBACH, ATTORNEY GENERAL,

       **Plaintiff,**

v.

                                 Case No. 23-4035-DDC-RES

MACQUARIE ENERGY LLC, and
JOHN DOES 1 through 10,

       **Defendants.**

## MEMORANDUM AND ORDER

In February 2021, Winter Storm Uri left some Kansas residents out in the cold—literally. This case's claims ask whether one of the largest natural gas marketers in the United States also left Kansas residents out in the cold—figuratively.  The State of Kansas alleges that Macquarie Energy LLC used a February 16, 2021 natural gas trade to manipulate the price of natural gas to Macquarie's substantial benefit and to Kansas residents' substantial harm.  Before the court is defendant Macquarie's Motion to Dismiss (Doc. 10) and plaintiff Kansas's Motion for Leave to File Amended Complaint (Doc. 29).  The court elected to decide these two motions in the same Memorandum and Order because they're intertwined with one another. *See* Doc. 38.  The court grants defendant's Motion to Dismiss (Doc. 10) and denies plaintiff's Motion for Leave to File Amended Complaint (Doc. 29).  This ruling puts plaintiff's claims on ice, for now at least, pending any proper re-filing in federal or state court.

Defendant allegedly manipulated the market by purchasing natural gas at an exorbitant rate during the height of Winter Storm Uri.  Defendant subsequently reported substantially higher net profits than in the previous fiscal year.  Meanwhile, the Kansas Corporation

Commission approved a rate increase for Kansas residential natural gas consumers.  The rate increase helps to cover the utilities' excess costs during the storm.  So, Kansas residents now are paying off Winter Storm Uri's price spikes through their utility bills.  Plaintiff seeks redress for defendant's alleged manipulation of the natural gas market under the Commodities Exchange Act (CEA), a federal statute that aspires to "ensure fair practice and honest dealing on the commodity exchanges." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 401 n.9 (1982) (Powell, J., dissenting).

To pursue such redress, plaintiff filed this action in state court in Shawnee County, Kansas.  *See* Doc. 1-1.  Defendant properly removed it to federal court.  Doc. 1.  Six days later, defendant filed a Motion to Dismiss (Doc. 10) for lack of jurisdiction, failure to state a claim, and federal pre-emption.

This Order grants defendant's Motion to Dismiss (Doc. 10) on the grounds of derivative jurisdiction.  Under *Lambert Run Coal Co. v. Baltimore & O.R. Co.*, when a party removes a case from state court, and the state court had no subject matter jurisdiction over the action, then the federal court likewise possesses no subject matter jurisdiction.  258 U.S. 377, 382 (1922).  That is, the federal court's jurisdiction in the context of removal must derive from the state court's jurisdiction.  *Id*.  This court holds that the Shawnee County District Court lacked jurisdiction over the case when defendant removed this case to federal court.  So, the derivative jurisdiction doctrine applies, and this court can't exercise jurisdiction over plaintiff's claims.  The court reaches this conclusion in four consecutive steps.

*First*, the court recognizes that the CEA statutorily limits a state court's jurisdiction over a CEA violation.  The statute only allows an authorized state official to bring suit for a CEA violation where the defendant is a "person registered under" the CEA.  7 U.S.C. § 13a-2(8)(A).

*Second*, the court concludes that plaintiff never alleges or otherwise demonstrates in its state court Petition (Doc. 1-1) that defendant was such a "person registered." This omission deprived the state court of jurisdiction at the time of removal to federal court. *Third*, under *Lambert Run*, 258 U.S. at 382, and Tenth Circuit precedent in *High Lonesome Ranch, LLC v. Board of County Commissioners*, 61 F.4th 1225 (10th Cir. 2023), when a party timely invokes the derivative jurisdiction doctrine, that doctrine erects a procedural bar to a federal court's exercise of jurisdiction. Defendant invoked the derivative jurisdiction doctrine only six days after removal. *See* Doc. 10. *Fourth*, the court rejects plaintiff's attempt to cure the lack of subject matter jurisdiction by amendment because "'a plaintiff cannot circumvent [derivative jurisdiction's procedural] bar merely by filing an amended complaint invoking federal jurisdiction.'" *Goodwill v. eTitle Ins. Agency*, No. 21-4108, 2022 WL 1741595, at *2 n.3 (10th Cir. May 31, 2022) (quoting *Ricci v. Salzman*, 976 F.3d 768, 773 (7th Cir. 2020)). Thus, plaintiff can't cure its deficient state court pleading with an amended complaint. At the time of removal—the dispositive moment which determines whether a party can invoke the derivative jurisdiction doctrine—the state court lacked jurisdiction. Plaintiff can't cure that omission now with an amended pleading. Given these four steps, this court can't exercise jurisdiction under the derivative jurisdiction doctrine, and so it grants defendant's Motion to Dismiss (Doc. 10).

This Order also denies plaintiff's Motion for Leave to File Amended Complaint (Doc. 29). Under *Bradley v. Val-Mejias*, if the court would dismiss a complaint even after amendment, then amendment is futile, and the court may deny leave. 379 F.3d 892, 901 (10th Cir. 2004). Plaintiff's amendment is futile because it can't fix plaintiff's problem—the failure to allege CEA registration—at the time of removal. The court thus exercises its discretion to deny plaintiff's Motion for Leave to File Amended Complaint (Doc. 29).

This Memorandum and Order explains the court's reasoning in this sequence:  Part I provides the relevant background facts.  Part II takes up defendant's Motion to Dismiss (Doc. 10), summarizing the legal standard for derivative jurisdiction and then analyzing whether the court must apply it in this case.  Next, in Part III, the court addresses plaintiff's Motion for Leave to File Amended Complaint (Doc. 29) by evaluating the amendment's futility.  And in Part IV, the court recites its conclusions.

## I.    Background

The following facts come from plaintiff's state court Petition (Doc. 1-1).  The court accepts these facts as true and views them in the light most favorable to plaintiff, the party opposing the Motion to Dismiss.  *Doe v. Sch. Dist. No. 1*, 970 F.3d 1300, 1304 (10th Cir. 2020) (explaining that on a motion to dismiss the court "accept[s] as true all well-pleaded factual allegations in the complaint and view[s] them in the light most favorable to" the party opposing the motion (citation and internal quotation marks omitted)).

### A.  Winter Storm Uri and Natural Gas Prices in Kansas

In February 2021, Winter Storm Uri disrupted natural gas markets in Kansas and neighboring states.  Doc. 1-1 at 6 (Pet. ¶ 4).  The storm precipitated extremely cold temperatures that increased the demand for natural gas and, correspondingly, decreased its supply.  *Id*. at 29 (Pet. ¶ 79).  These supply-demand dynamics caused natural gas prices to rise, with benchmark prices in the region jumping two-, three-, or ten-fold and, for a short time, even 100-fold in certain locations.  *Id*. at 6–7 (Pet. ¶ 4).  Defendant, one of the largest natural gas marketers in the United States, sells large volumes of natural gas in the region, and particularly at the Southern

Star (SS) location.  *Id*. at 6 (Pet. ¶ 2).  The SS location, centered in Kansas, encompasses numerous gas delivery points on the Southern Star Gas Central Pipeline.[1]  *Id*.

On the morning of February 16, 2021, defendant purchased natural gas for next-day delivery within the SS location at "the single highest price ever paid for Southern Star natural gas."  *Id*. at 7 (Pet. ¶ 5) (emphasis omitted).  A next-day delivery purchase is a "spot" deal, used by a local distributor to "top up their supplies when baseload supply levels are inadequate to meet projected daily demand."  *Id*. at 18 (Pet. ¶ 51).  As a result of the spot deal on February 16, 2021, the Gas Daily price for the SS location increased by hundreds of dollars per MMBtu.[2]  *Id*. at 8 (Pet. ¶ 8).  The Gas Daily price is a location-specific benchmark index price, calculated by S&P Global Platts, which functions as a representative market price based on qualifying natural gas transactions from the previous day.  *Id*. at 6, 19–20 (Pet. ¶¶ 2, 56–59).  Platts Gas Daily price for the SS location started at $2.545 on February 1, 2021, jumped to $329.595 on February 13–16, 2021, and then hit a high of $622.785 on February 17, 2021, before dropping to $44.530 on February 18, 2021, and leveling out at $2.465 by the end of the month.  *Id*. at 25 (Pet. ¶ 70).

The Gas Daily price is important.  It affects exchange-traded futures and options contracts.  For example, in a swing future contract, a market participant speculates on—and may capture an increase in—a benchmark price by purchasing, ahead of time, a fixed quantity of natural gas at a fixed price (per MMBtu) for each day during the futures contract period.  *Id*. at 27 (Pet. ¶ 72).  If the Gas Daily price per MMBtu rises over the fixed price, the value of the swing future contract also rises, and vice versa.  *Id*. (Pet. ¶ 73).

---

[1]    "The Southern Star Central Gas Pipeline (the "Southern Star Pipeline") is an interstate natural gas pipeline centered in Kansas and extending to Missouri and Oklahoma, as well as Colorado, Wyoming, Texas, and Nebraska."  Doc. 1-1 at 22 (Pet. ¶ 63).

[2]    An MMBtu unit is the typical unit used to express the volume of natural gas.  Dollars per MMBtu is the typical unit used to express the price of natural gas.  Doc. 1-1 at 16 (Pet. ¶ 46).

### B.  Defendant's Alleged Manipulation of the Southern Star Gas Daily Price

Following an investigation into natural gas pricing during Winter Storm Uri, plaintiff sued, filing its Petition in the District Court of Shawnee County, Kansas on February 15, 2023. *Id*. at 1.  In the state court Petition, plaintiff alleges that defendant intentionally manipulated the February 17, 2021 SS Gas Daily price by making an "economically irrational" gas trade on February 16, 2021.  *Id*. at 6, 8 (Pet. ¶¶ 5, 12).  In that trade, defendant agreed to pay an "extremely high price" for a "relatively large volume of gas."  *Id*. at 7, 8, 31 (Pet. ¶¶ 5, 12, 89).  Plaintiff asserts that defendant, in so doing, violated the Commodities Exchange Act (CEA), 7 U.S.C. §§ 1-27f, because defendant manipulated—or at least acted recklessly about—the SS Gas Daily price.  *Id*. at 46 (Pet. ¶ 135).  Plaintiff also contends defendant employed a manipulative and deceptive device to inflate the SS Gas Daily price.  *Id*. at 47–48 (Pet. ¶¶ 142–43).

According to plaintiff, the SS "Gas Daily price is highly susceptible to manipulation" because each day "there are far fewer qualifying transactions" and "substantially lower daily qualifying-transaction volumes" in the SS location than in other trading locations.  *Id.* at 28 (Pet. ¶¶ 75–76).  These few qualifying SS location transactions, alone, determine the SS Gas Daily price for the next day, increasing each individual transaction's significance.  *Id.* at 28–29 (Pet. ¶¶ 76–78).  Indeed, on February 16, 2021, there were just two qualifying transactions at the SS location:  defendant made one of the two trades, and the other was made by an unrelated participant.  *Id*. at 31 (Pet. ¶ 92).  The other qualifying transaction had a "materially lower" and "sharply disparate" price from the price defendant paid on the same day, though the two trades were "otherwise similar."  *Id*.  Defendant's February 16 trade allegedly "generated material additional trading revenues for Macquarie" while imposing "material additional costs on Kansas residents."  *Id*. at 8 (Pet. ¶¶ 9–10).

## C.  Revenues for Defendant and Costs for Kansans

On one side of the coin, the additional trading revenues associated with Winter Storm Uri boosted the Macquarie Group Limited's (MGL's) overall profit for the year by 10%.  *Id*. at 40 (Pet. ¶ 119).  Defendant is a wholly owned subsidiary of Macquarie Bank Limited, which is a wholly owned subsidiary of MGL.  *Id*. at 11 (Pet. ¶ 26).  MGL's Commodities and Global Markets (CGM) business, which houses defendant, saw an increase in fiscal 2021 net profits of 50% over fiscal 2020.  *Id*. at 41 (Pet. ¶ 122).  This increase occurred despite CGM's fiscal 2021 tracking flat with fiscal 2020 for the first 10.5 months of the fiscal year—through early February 2021.  *Id*. at 43 (Pet. ¶ 126).  And MGL executives warned—when announcing the fiscal 2021 results—that they expected CGM's profits for fiscal 2022 "to be significantly down on FY 21." *Id.* at 42 (Pet. ¶ 125).  In other words, if the Petition's allegations prove true, they could provide a basis to infer that the February 16 trade turned out really well for defendant.

On the flip side, Kansas residents experienced material additional costs.  *Id*. at 8 (Pet. ¶ 10).  Plaintiff alleges that Kansas residents experienced these excess costs via three "distinct streams."  *Id*. at 44–45 (Pet. ¶ 131).  *First*, the excess costs affected Kansans' utility bills.  *Id*. The Kansas Corporation Commission approved rate increases for Kansas residential ratepayers designed to recapture Kansas utilities' excess costs in February 2021.  *Id*.  Plaintiff attributes more than $50 million of the utility bills' excess costs to defendant.  *Id*. at 45 (Pet. ¶ 132). *Second*, local natural gas marketers passed their purchase costs on to non-residential customers in Kansas—immediately—through February 2021 invoices.  *Id*. at 44–45 (Pet. ¶ 131).  *Third*, large commercial and industrial entities in Kansas purchased natural gas directly in February 2021 and immediately confronted spiked costs.  *Id*.  Plaintiff anticipates these final two "streams" will reveal a "far larger" "aggregate harm to Kansas residents" than even the $50

million figure derived from the first stream.  *Id*. at 45 (Pet. ¶ 132).  In other words, the

allegations, if true, may provide a basis to infer that the trade didn't turn out so well for Kansans.

In response to these allegations, defendant filed a Motion to Dismiss (Doc. 10).  The

court takes it up below.

## II.  Defendant's Motion to Dismiss

In its Motion to Dismiss (Doc. 10), defendant alleges three reasons for dismissal:  lack of

subject matter jurisdiction under a derivative jurisdiction analysis; failure to state a claim under

the CEA; and federal pre-emption under the Natural Gas Act and the exclusive jurisdiction of the

Federal Energy Regulatory Commission (FERC).  Doc. 10 at 9.  The court necessarily begins

with the question of subject matter jurisdiction because a court without jurisdiction doesn't

possess the "'power to declare the law.'"  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94

(1998) (quoting *Ex parte McCardle*, 7 Wall. 506, 514 (1868)).  And without such power, "'the

only function remaining to the court is that of announcing the fact and dismissing the cause.'"

*Id*.  Defendant challenges the court's subject matter jurisdiction by invoking the derivative

jurisdiction doctrine.  The court thus discusses the legal standard for derivative jurisdiction, and

then applies it to the present dispute, below.

### A.  Derivative Jurisdiction Doctrine

#### 1.  Derivative Jurisdiction and Cases Not Removed under 28 U.S.C. § 1441

First, the court outlines derivative jurisdiction and the boundaries Congress has placed

around it.  Defendant alleges that this court lacks subject matter jurisdiction because the state

court—based on the face of plaintiff's Petition (Doc. 1-1)—never had jurisdiction before

defendant removed it to our court.  In support, defendant invokes the derivative jurisdiction

doctrine.

The Supreme Court explained the doctrine, which has persisted for more than a century, this way:  "The jurisdiction of the federal court on removal is, in a limited sense, a derivative jurisdiction.  If the state court lacks jurisdiction of the subject-matter or of the parties, the federal court acquires none, although it might in a like suit originally brought there have had jurisdiction." *Lambert Run*, 258 U.S. at 382.  In 2002, Congress amended 28 U.S.C. § 1441(f) and abolished the doctrine for cases removed under the general removal statute, 28 U.S.C. § 1441.  *High Lonesome Ranch*, 61 F.4th at 1239.  But, in that 2002 amendment to § 1441(f), Congress explicitly confined derivative jurisdiction's abolition to the general removal statute alone.  *Id*.  So, derivative jurisdiction still applies to "those [cases] removed under other sections."  *Id*.  The derivative jurisdiction doctrine thus remains "entrenched," "binding," and "well-settled" for cases removed under a provision other than § 1441, even though "the justification for the rule is hardly obvious[.]"  *Rodas v. Seidlin*, 656 F.3d 610, 615–16 (7th Cir. 2011).  This inscrutable justification may have prompted recent circuit decisions to narrow the doctrine's applicability, treating it as a "defect in removal" rather than "an essential ingredient to federal subject matter jurisdiction."  *Id*. at 619.  The court next outlines the doctrine's narrowed boundaries under Tenth Circuit precedent.

### 2.  Derivative Jurisdiction as a Procedural Bar

In *High Lonesome Ranch*, the Tenth Circuit joined six other circuits in holding that derivative jurisdiction is a "'procedural bar' to exercising subject-matter jurisdiction," rather than a "latent subject-matter-jurisdiction defect," and thus is "waivable."  61 F.4th at 1240–41 (citing *Rodas*, 656 F.3d at 619–22.).  In contrast, parties can attack Article III subject-matter jurisdiction at any time, even after a final judgment.  *Id*. at 1240.  But for the derivative jurisdiction doctrine, if a party "fails to raise the issue at removal" then the party "waives its right to later litigate the

propriety of removal jurisdiction." *Id.* at 1240 (citing *Grubbs v. Gen. Elec. Credit Corp.*, 405 U.S. 699, 702–03 (1972)).  As a result, a party must raise a derivative jurisdiction issue within "the 30-day window for challenging removal defects [under] 28 U.S.C. § 1447(c)" or the party waives it.  *Lake Irwin Coal. v. Smith*, No. 19-CV-01056, 2023 WL 3945471, at *3 (D. Colo. June 12, 2023); *see also Ricci*, 976 F.3d at 774 ("[W]e think it appropriate to adopt a . . . rule requiring defendants to assert the derivative jurisdiction doctrine within 30 days from removal.").  In this sense, derivative jurisdiction now functions like a removal defect that a party must raise promptly after removal and not for the first time on appeal.

### 3.  Derivative Jurisdiction and Defendant's Removal

To determine whether the court should apply the derivative jurisdiction doctrine in this case, this Order first considers the basis for removal.  Removal under 28 U.S.C. § 1441 disqualifies a case from derivative jurisdiction, but removal under other sections does not.  *High Lonesome Ranch*, 61 F.4th at 1239.  Defendant removed the action on three grounds.  *First*, defendant removed under 28 U.S.C. § 1331, which provides subject matter jurisdiction over cases presenting a federal question.  Doc. 1 at 2.  *Second*, defendant removed under 7 U.S.C. § 13a-2(2), a section of the CEA which provides federal court jurisdiction over suits brought alleging a CEA violation.  *Id.*  *Third*, defendant removed under 7 U.S.C. § 13a-2(8), another section of the CEA.  *Id.*  Under this provision, an authorized state official may file a case in state court when the case asserts—specifically—an antifraud CEA violation.  7 U.S.C. § 13a-2(8)(A).  But the CEA then allows a defendant to remove the proceeding to federal court.  *Id.* at § 13a-2(8)(B).  So, defendant didn't remove this case from state court under the general removal statute, 28 U.S.C. § 1441, but under other removal provisions.  The entrenched, well-settled derivative jurisdiction doctrine thus remains in play here.

The procedural posture of this case also permits the court to apply the derivative jurisdiction doctrine.  While the Tenth Circuit has held derivative jurisdiction waivable, here defendant raised the issue in its Motion to Dismiss (Doc. 10) (showing filing date of May 8, 2023), filed less than a week after its Notice of Removal (Doc. 1) (showing removal on May 2, 2023), and easily within the 30-day window arising under 28 U.S.C. § 1447(c).

Defendant has met the requisite circumstances for the court to consider the derivative jurisdiction doctrine.  This doctrine, which "applies unless abrogated," thus applies here, provided that the state court lacked jurisdiction at removal.  *Rodas*, 656 F.3d at 618.  The court next addresses the question whether the Shawnee County, Kansas District Court—the state court where plaintiff originally filed—possessed subject matter jurisdiction at removal from which this court may derive jurisdiction.  The court begins by reciting the legal standard for state court jurisdiction.

### B.  State Court Jurisdiction

Generally, a state court "may assume subject-matter jurisdiction over a federal cause of action," thus enjoying a presumed "concurrent jurisdiction" with the federal courts.  *Gulf Offshore Co. v. Mobil Oil Corp.*, 453 U.S. 473, 477–78 (1981).  But, Congress may rebut this presumption favoring concurrent jurisdiction if it "affirmatively ousts the state courts of jurisdiction over a particular federal claim."  *Tafflin v. Levitt*, 493 U.S. 455, 458–59 (1990).  In the CEA, Congress did just that.  The CEA primarily provides for exclusive federal jurisdiction over claims premised on CEA violations.  7 U.S.C. § 13a-2(2).  But the CEA does include one provision permitting state court jurisdiction over CEA violations in limited circumstances.  That provision allows an authorized state official to proceed in state court on a CEA violation claim if

the state official (i) alleges a violation of a CEA "antifraud provision" and (ii) brings the action against a "person registered" under the CEA.  7 U.S.C. § 13a-2(8)(A).

Here, plaintiff and defendant dispute the state court's jurisdiction under the limitations of this CEA provision.  Their arguments turn on the "person registered" prong and belong in two distinct groups:  *First*, defendant argues, plaintiff failed to plead sufficient facts in its Petition to show that defendant is a "person registered" under the CEA.  Doc. 10 at 10.  Plaintiff's failure to satisfy its burden of pleading, defendant asserts, deprives the state court of jurisdiction and thus implicates the derivative jurisdiction doctrine.  *Id*.  Plaintiff concedes that it didn't include allegations of defendant's registration but suggests it can easily cure such a deficiency with an amendment.  Doc. 30 at 12.  *Second*, defendant was a "person registered" at the time of the alleged violation, but not when plaintiff filed this suit.  *Id*. at 10; Doc. 34 at 4.  Plaintiff asserts defendant's "person registered" status when the alleged violation occurred suffices to confer jurisdiction on a state court.  Doc. 30 at 11.  Plaintiff argues that one of the rules associated with CEA registration resolves this issue.  *Id*.  This rule reads:  "Withdrawal from registration does not constitute a release from liability for any violation of the [CEA] . . . which occurred while a person was registered."  *Id*. (citing NFA Registration Rule 601(e)).  Defendant responds, claiming that plaintiff, in effect, inappropriately adds words to the CEA with this argument, and contends defendant's registration status at filing—rather than at alleged violation—governs. Doc. 34 at 5.

The court, then, must determine whether the state court had jurisdiction at removal by answering two questions:  May an amendment in federal court, after removal, cure deficient jurisdictional pleading in state court?  And if so, does the CEA's "person registered"

jurisdictional requirement compel registration when the alleged violation occurred, or when the plaintiff files suit?

### 1.   Deficient Jurisdictional Pleading and Cure by Amendment

When a court's jurisdiction is limited, the party seeking to exercise jurisdiction "'must allege in his pleading the facts essential to show jurisdiction.'"  *U.S. ex. rel. Gen. Rock & Sand Corp. v. Chuska Dev. Corp.*, 55 F.3d 1491, 1495 (10th Cir. 1995) (quoting *Penteco Corp. v. Union Gas Sys., Inc.*, 929 F.2d 1519, 1521 (10th Cir. 1991)).  If a party fails to allege the requisite essential facts, Title 28 U.S.C. § 1653 provides that "[d]efective allegations of jurisdiction may be amended, upon terms, in the trial or appellate courts."  "A court should not dismiss an action based solely on a technical error in jurisdictional pleading, but should rather freely grant leave to amend jurisdictional allegations.  Leave to amend will be freely granted and jurisdiction deemed proper if amended allegations are not contested and nothing appears to bar jurisdiction[.]"  3 JAMES W. MOORE ET AL., MOORE'S FEDERAL PRACTICE – CIVIL § 15.14 (3d ed. 2023).

But, "'when a defendant timely raises the derivative jurisdiction doctrine, it erects a mandatory bar to the court's exercise of federal jurisdiction, and a plaintiff cannot circumvent that bar merely by filing an amended complaint invoking federal jurisdiction.'"  *Goodwill*, 2022 WL 1741595, at *2 n.3 (quoting, in a footnote, *Ricci*, 976 F.3d at 773).  Even though the derivative jurisdiction doctrine is "only a procedural bar—and even though the justification for the rule is hardly obvious—it is nevertheless binding on [the court].  It therefore remains mandatory.  [The court] must apply it if properly invoked."  *Ricci*, 976 F.3d at 773 (internal quotation marks, brackets, and citations omitted).  The Supreme Court has allowed a court to consider "finality, efficiency and economy" when determining a removal defect's effect, but

those considerations only "become overwhelming" after a case "has been tried in federal court" on the merits. *Caterpillar Inc. v. Lewis*, 519 U.S. 61, 75 (1996). "When the derivative jurisdiction doctrine is timely raised, then, it properly results in dismissal without prejudice." *Ricci*, 976 F.3d at 773.

Here, plaintiff concedes it "fail[ed] to include the allegation of Defendant's registration at the time of injury in the petition." Doc. 30 at 12. Plaintiff should have alleged this fact because it is essential to establish state court jurisdiction under the CEA. *See* 7 U.S.C. § 13a-2(8)(A). Plaintiff urges the court to respond to its failure to allege in one of two ways.

*First*, plaintiff would have the court adopt a more flexible approach to pleading jurisdiction and assume state court jurisdiction here. Plaintiff cites a Seventh Circuit case from 1978 and argues that "'it is not essential that a complainant set forth the statutory basis for the court's jurisdiction in order for the court to assume jurisdiction[.]'" Doc. 37 at 2 (quoting *Rohler v. TRW, Inc.*, 576 F.2d 1260, 1264 (7th Cir. 1978)). Plaintiff thus urges the court to "assume jurisdiction" because plaintiff "alleged a basis for the assumption of jurisdiction through the alleged facts of the case and reliance on the CEA[.]" *Id.*

*Second*, plaintiff considers this jurisdictional omission as a "'technical' jurisdictional defect" along the lines of those defects curable by amendment as "contemplated in 28 U.S.C. § 1653." *Id.* at 3. So, plaintiff asks the court for leave to amend the state court Petition (Doc. 1-1) and allow plaintiff to "add an allegation" about defendant's registered status. Doc. 29 at 2. To persuade the court, plaintiff asserts that defendant's "attempt to get this case dismissed on something so easily cured . . . reeks of gamesmanship." Doc. 30 at 12.

Perhaps it is, but the court can't relax pleading requirements and assume jurisdiction under the authority of a Seventh Circuit case from 45 years ago. Also, while the court

recognizes the "technical" nature of the Petition's jurisdictional defect as well as the court's obligation to grant leave to amend freely, both are irrelevant to the derivative jurisdiction doctrine, where a "'mandatory bar'" binds the court. *Goodwill*, 2022 WL 1741595, at *2 n.3 (quoting *Ricci*, 976 F.3d at 773). Defendant has invoked the derivative jurisdiction doctrine properly, and the court must apply it to conform to precedent. This result also makes sense because at removal—the moment in time determining whether the derivative jurisdiction doctrine should apply—the state court lacked jurisdiction. An amendment now can't rewind the clock to that moment in time.

This outcome means that the court, in essence, will require a reboot of this case, which disserves efficiency and economy. But the Supreme Court only has allowed such considerations to overwhelm a removal defect after the case has been tried, not at the early stages of the litigation. *See Caterpillar* 519 U.S. at 75. While defendant's maneuver looks like gamesmanship, it's necessarily effective. Defendant has found a rule of the game that works in its favor, and the parties must obey the rules. So too must the court. The court thus holds the proper result is dismissal without prejudice.

## 2. Timing of the "Person Registered" Requirement

Because an amendment can't cure deficient jurisdictional pleading in state court after removal, the court need not reach the timing of the CEA's "person registered" requirement. Even if plaintiff is correct, *i.e.*, that the time that matters is defendant's registration when the CEA violation occurred, plaintiff never pleaded that registration status, and the deficient pleading still deprives the state court of jurisdiction. So, whether the requirement presumes registration at violation or at filing is immaterial here.

### C.  Defendant's Other Bases for Removal

Similar logic prevents the court from reaching defendant's other two grounds for dismissal:  failure to state a claim under the CEA and federal pre-emption under the Natural Gas Act (including the purportedly exclusive jurisdiction of FERC).  If the court grants the Motion to Dismiss on the basis of derivative jurisdiction, it need not reach the merits of these other two bases.  Indeed, it should not "declare the law," given the court's lack of jurisdiction.  *Steel Co.*, 523 U.S. at 94 (quoting *Ex parte McCardle*, 7 Wall at 514).

### III.    Plaintiff's Motion for Leave to File Amended Complaint

Plaintiff's Motion for Leave to File Amended Complaint (Doc. 29) seeks to add a single allegation:  that defendant was a "person registered" under the CEA during Winter Storm Uri, at the time of the alleged CEA violation.  Doc. 29 at 2.  In so doing, plaintiff hopes to cure "a potential technical defect" in its pleading and establish state court jurisdiction under 7 U.S.C. § 13a-2(8)(A) of the CEA.  *Id.* at 3–4.  Defendant opposes the motion.  *See* Doc. 34.  In the following sections, the court discusses, first, the legal standard for leave to amend and, next, plaintiff's motion here in light of that standard.

### A.  Legal Standard for Leave to Amend a Complaint

If a party doesn't meet the twenty-one-day requirement to amend a pleading as a matter of course under Fed. R. Civ. P. 15(a)(1), then the party may amend only with the opposing party's written consent or the court's leave, which the court should give freely when "justice so requires."  Fed. R. Civ. P. 15(a)(2).  A court may refuse leave to amend "upon a showing of undue delay, bad faith or dilatory motive, failure to cure deficiencies by amendments previously allowed, or undue prejudice to the opposing party, or futility of amendment, etc."  *Castleglen,*

*Inc. v. Resol. Tr. Corp.*, 984 F.2d 1571, 1585 (10th Cir. 1993) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

A court may deny a motion for leave to amend a complaint if the putative amendment is futile. *Id.* A party's amendment is futile when "'the complaint, as amended, would be subject to dismissal.'" *Bradley*, 379 F.3d at 901 (quoting *Jefferson Cnty. Sch. Dist. v. Moody's Inv.'s Servs.*, 175 F.3d 848, 859 (10th Cir. 1999)). In *Bradley*, for example, the district court denied the plaintiff's motion to amend his complaint because the statute of limitations barred the proposed amendment's additional claims. 379 F.3d at 901. The Tenth Circuit affirmed. *Id.* The court considers plaintiff's Motion for Leave to File Amended Complaint (Doc. 29) in light of the futility standard, below.

### B.  Futility

Plaintiff seeks to "add an allegation that Defendant registered [under the CEA] on or before December 31, 2012 and remained registered through May 29, 2021." Doc. 29 at 2. Plaintiff argues this amendment rectifies "an oversight" which "can resolve Defendant's subject-matter jurisdiction argument." *Id.* at 3–4.

But here, even if the court granted plaintiff leave to amend, the court nonetheless would dismiss plaintiff's Petition under the derivative jurisdiction doctrine. In such a situation, the court may deny leave to amend based on futility. *Bradley*, 379 F.3d at 901. The court would dismiss the Petition—irrespective of amendment—because the amendment wouldn't mend the deficient state court jurisdiction at removal. That lack of state court jurisdiction compels the court to apply the derivative jurisdiction doctrine. *See Lambert Run,* 258 U.S. at 382 ("If the state court lacks jurisdiction of the subject-matter or of the parties, the federal court acquires none, although it might in a like suit originally brought there have had jurisdiction."). As

outlined in Part II above, once defendant properly invoked the derivative jurisdiction doctrine within 30 days after removal, the doctrine erected "'a mandatory bar to the court's exercise of federal jurisdiction.'"  *Goodwill*, 2022 WL 1741595, at *2 n.3 (quoting *Ricci*, 976 F.3d at 773). So, just as the statute of limitations barred the proposed amendment in *Bradley*, the derivative jurisdiction doctrine bars the proposed amendment here.  *See Bradley*, 379 F.3d at 901.

### IV.    Conclusion

The court grants defendant's Motion to Dismiss (Doc. 10) based on the derivative jurisdiction doctrine, without reaching any other asserted grounds for dismissal.  The court also denies plaintiff's Motion for Leave to File Amended Complaint (Doc. 29) because, given the procedural bar imposed by the derivative jurisdiction doctrine, amendment is futile.

The court recognizes this result, in effect, ices the disputes and creates numerous inefficiencies.  Indeed, the derivative jurisdiction doctrine has been "heavily criticized" for just such inefficiencies.  *High Lonesome Ranch*, 61 F.4th at 1239 (citation and internal quotation marks omitted).  But Congress hasn't chosen to abolish derivative jurisdiction for cases removed under the provisions relevant here.  *Id*.  And plaintiff could have avoided this outcome by either filing in federal court initially or properly pleading state court jurisdiction at the outset.  So, the court's hands are tied.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant's Motion to Dismiss (Doc. 10) is granted.  The case is dismissed without prejudice.

**IT IS FURTHER ORDERED BY THE COURT THAT** plaintiff's Motion for Leave to File Amended Complaint (Doc. 29) is denied.

**IT IS SO ORDERED.**

Dated this 5th day of October, 2023, at Kansas City, Kansas.

                                          **s/ Daniel D. Crabtree**
                                          **Daniel D. Crabtree**
                                          **United States District Judge**